Jack Arseneault (JA 6292)
David W. Fassett (DWF 1636)
Arseneault, Whipple, Farmer, Fassett & Azzarello, LLP
560 Main Street
Chatham, New Jersey 07928

Attorneys for Edgewood Properties, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDGEWOOD PROPERTIES, INC., | **ELECTRONICALLY FILED** |
| Plaintiff, | |
| v. | **CIVIL ACTION NO. _____** |
| J&L MANAGEMENT CORPORATION, GOLDER ASSOCIATES, INC., and ARCADIS U.S., INC., | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

Edgewood Properties, Inc. ("Edgewood"), Plaintiff, by its attorneys, state and allege the following upon information and belief:

**THE PARTIES**

1.      Edgewood is a New Jersey corporation with its principal place of business in Piscataway, New Jersey.

2.      Defendant J&L Management Corporation ("J&L") is an Ohio corporation with its principal place of business in Mt. Clemens, Michigan.

3.      This Court has specific personal jurisdiction over J&L because Edgewood's claims asserted herein arise out of J&L's forum-related activities, described herein, such that J&L should reasonably anticipate being sued here.

4.      This Court has general jurisdiction over J&L because J&L's contacts with the forum are continuous and systematic.

5.      Defendant Golder Associates, Inc. ("Golder") is a Georgia corporation with its principal place of business in Atlanta, Georgia.

6.      This Court has specific personal jurisdiction over Golder because Edgewood's claims asserted herein arise out of Golder's forum-related activities, described herein, such that Golder should reasonably anticipate being sued here.

7.      This Court has general jurisdiction over Golder because Golder's contacts with the forum are continuous and systematic.

8.      Defendant Arcadis U.S., Inc. ("Arcadis") is a Delaware Corporation with its principal place of business in Denver, Colorado.

9.      This Court has specific personal jurisdiction over Arcadis because Edgewood's claims asserted herein arise out of Arcadis's forum-related activities, described herein, such that Arcadis should reasonably anticipate being sued here.

10.      This Court has general jurisdiction over Arcadis because Arcadis's contacts with the forum are continuous and systematic.

**JURISDICTION & VENUE**

11.      This Court has subject matter jurisdiction over the following claims pursuant to either 28 U.S.C. § 1367, 28 U.S.C. § 1331, or 28 U.S.C. § 1332.

12.      The amount in controversy exceeds $75,000.

13.      Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district and the defendants are subject to personal jurisdiction in this district.

2

## FACTUAL ALLEGATIONS

14.     From approximately 1950 to 2004, Ford Motor Company ("Ford") operated an automobile manufacturing plant on US Route 1 in Edison, New Jersey (the "Edison Plant" or the "Site").

15.     In February 2004, Ford closed the Edison Plant and prepared to decommission its facilities.

16.     During the relevant time period, Ford Motor Land Development Corporation ("FMLDC") was a wholly-owned subsidiary of Ford and acted as Ford's agent.  Hereafter, all references to Ford shall include Ford and/or FMLDC unless otherwise expressly distinguished.

17.     Ford hired Golder and Arcadis to serve as consultants responsible for environmental issues related to decommissioning the Edison Plant.  As such, they served as Ford's agents and advisors.

18.     Ford hired MIG/Alberici, LLC ("Alberici") to serve as the general contractor responsible for decommissioning the Edison Plant.  Alberici acted as Ford's agent with respect to the decommissioning.

19.     Ford and/or Alberici hired multiple subcontractors, including, among others, EQ Northeast, Inc. ("EQ") and J&L, to assist in decommissioning the Edison plant.   These subcontractors were agents of Alberici and/or Ford.

20.     As part of the decommissioning, Ford and Alberici planned to demolish and remove, among other things, concrete buildings, foundations, and floor slabs located at the Edison Plant.

21.     Ford and Alberici anticipated that such concrete would be crushed and reused at the Site as fill.

22.     Upon information and belief, as of June 2004, Ford anticipated that it would make a profit on the sale of the Edison Site notwithstanding the expense of decommissioning the Site and demolishing its buildings.

23.     On September 14, 2004, Ford and Alberici, with input from Golder and Arcadis, requested permission from the NJDEP to re-use crushed concrete with no PCB detections and masonry brick as general backfill at the Site.

24.     Upon information and belief, Ford, Alberici, Golder and Arcadis did not request permission from the NJDEP to re-use crushed concrete with detectable PCB contamination because they feared it would complicate and delay the NJDEP's approval of the decommissioning and subsequent sale of the Site.

25.     On November 9, 2004, the NJDEP granted Ford and Alberici permission to re-use crushed concrete with no PCB detections as backfill throughout the Site. However, the NJDEP specifically directed that "concrete floor surfaces that have been determined to contain positive detections of PCBs" could "not be used as fill" and must "be disposed offsite."

26.     Although the NJDEP did not grant Ford and Alberici permission to distribute the concrete for re-use offsite, Ford and Alberici decided to avoid the cost of properly disposing of concrete with positive PCB detections by contracting with third parties to remove the concrete and re-use it offsite.

27.     Ford and Alberici did not apply for the proper permits, or otherwise seek the NJDEP's permission, to distribute concrete with positive PCB detections for re-use offsite.

28.     The NJDEP classifies PCBs and other contaminants into three categories, based upon the levels of the contaminants:

       (a)     Residential Direct Contact Soil Cleanup Criteria ("RDCSCC") (also known as residential or unrestricted use criteria);

       (b)     Non-Residential Direct Contact Soil Cleanup Criteria ("NRDCSCC") (also known as commercial or restricted use criteria); and

       (c)     Impact to Ground Water Soil Cleanup Criteria.

29.     Under NJDEP regulations and with appropriate permits, approvals or exemptions, material that satisfies the RDCSCC use criteria can be used on either residential or commercial sites. Material that satisfies the NRDCSCC use criteria can be used only on commercial sites, which must be deed restricted to ensure that no residential development occurs thereon. Material satisfying the Impact to Ground Water Soil Cleanup Criteria is not suitable for use on residential or commercial properties.

30.     Upon information and belief, based upon, among other things, their respective businesses and past experiences, Ford, Alberici, EQ, J&L, Golder and/or Arcadis are experienced and knowledgeable regarding proper and legal handling, testing and disposal of contaminated materials, including PCB-contaminated concrete.

31.     Upon information and belief, in or about November 2004, Ford, Alberici, Golder and Arcadis received analytical results with positive PCB detections in many of the core samples taken from concrete pad areas located inside the Edison Plant buildings.

32.     Upon information and belief, Ford and Alberici disagreed regarding which company should pay for the proper removal and disposal of concrete with positive PCB detections, which could not be re-used at the Edison Plant pursuant to the NJDEP's November 9, 2004 letter.

33.    Upon information and belief, Alberici took the position that it was not responsible for such costs because the removal and disposal of large volumes of PCB-contaminated concrete was not contemplated in Ford's project bid documents, prepared by Arcadis and/or Golder, on which Alberici relied to prepare its bid.

34.    Upon information and belief, in early December 2004, representatives of Ford, Alberici, Golder and Arcadis met and discussed a plan for handling and testing concrete for possible use as backfill throughout the Site and for distribution to others for possible re-use offsite.

35.    Upon information and belief, Ford, Alberici, Golder and Arcadis agreed on a plan to handle and test concrete for PCB contamination, which included stockpiling large volumes of concrete, crushing the concrete, placing the crushed concrete into smaller piles, and collecting a sample from each pile.

36.    Upon information and belief, Ford, Alberici, Golder and Arcadis intentionally, recklessly and/or negligently developed a plan to handle and test concrete for PCB contamination that failed to detect PCB contamination levels in the concrete they intended to distribute for possible re-use offsite.

37.    Upon information and belief, the sampling methodology employed by Ford, Alberici, Golder and Arcadis was so inadequate, that these parties had no real idea of the level of PCB contamination in the concrete they distributed.

38.    Upon information and belief, Ford, Alberici, Golder and Arcadis agreed to distribute to others, for re-use offsite, concrete that tested positive for PCB contamination without obtaining necessary permits, approvals or exemptions for such distribution.

39.     Upon information and belief, J&L and EQ agreed to participate in one or all of the plans described in paragraphs 34 through 36, and 38 above.

40.     Upon information and belief, National Crushing, the entity hired by Ford and/or Alberici to crush concrete from approximately November 2004 to April 2005, was never told by Ford, Alberici, EQ, J&L, Golder, or Arcadis that the concrete it was crushing contained contaminants, including PCBs.

41.     Upon information and belief, in or around January 2005, Ford, Alberici and J&L began distributing concrete with positive PCB detections pursuant to so-called "zero dollar sales agreements" signed by Ford.  Under the terms of such agreements, third parties received recycled concrete at no cost, and Ford received in exchange the benefit of avoiding millions of dollars in costs of transporting the concrete and disposing of it at an authorized landfill.

42.     In early February 2005, Frank Sellinger, an employee of Edgewood, met with Ford, Alberici and J&L representatives and/or agents, including Marty Huffman, in a trailer at the Edison Plant located on US 1 in Edison Township, New Jersey.

43.     At the meeting referenced in paragraph 42, immediately above, representatives and/or agents of Ford, Alberici and J&L, including Marty Huffman, discussed providing Edgewood with concrete *meeting the RDCSCC criteria* from the Edison Plant.

44.     At the meeting referenced in paragraph 42 above, representatives and/or agents of Ford, Alberici and J&L, including Marty Huffman, explained the concrete stockpiling and testing methods used at the Edison Plant and explained that concrete containing contaminants in excess of the RDCSCC criteria would *not* be distributed to Edgewood.

45.     On or about February 23, 2005, Sellinger again met with representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway, at the Edison Plant located on US 1 in Edison Township.

46.     At the meeting referenced in paragraph 45 immediately above, Mike Powell, Marty Huffman and Chris Hemingway personally showed Sellinger maps of the Edison Site containing boring locations and represented that Ford was distributing concrete only from uncontaminated locations of the Plant.

47.     At the meetings referenced in paragraphs 42 and 45 above, representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway knowingly, recklessly and/or negligently misrepresented that they would provide Edgewood concrete containing contaminants not exceeding the RDCSCC, while intending to provide Edgewood with concrete containing contaminants exceeding the RDCSCC criteria.

48.     At the meetings referenced in paragraphs 42 and 45 above, representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway, knowingly, recklessly, and/or negligently misrepresented that they would provide Edgewood concrete containing contaminants not exceeding the RDCSCC criteria with the intention that Edgewood would rely upon this representation.

49.     On February 23, 2005, Edgewood entered into a contract (the "First Contract") with Ford, whereby Ford agreed to supply Edgewood with 50,000 cubic yards of crushed concrete from the Edison Plant "containing constituents below NJDEP unrestrictive use criteria," i.e., below RDCSCC criteria.  Exhibit A.

50.     Upon information and belief, the First Contract was similar to existing "zero dollar sales agreements" that Ford had already executed with others, including without limitation Northeast Developers, Inc. and North Creek CCC.

51.     Under the First Contract, Ford, Alberici, EQ and J&L oversaw and/or were responsible for crushing, stockpiling, and testing the concrete, designating which piles of concrete would be loaded onto Edgewood's trucks, and loading the concrete onto Edgewood's trucks.  Edgewood was only responsible for transporting the concrete from the Edison Plant.

52.     Upon information and belief, Golder and/or Arcadis also were responsible for determining a sampling methodology for the concrete, testing the concrete, interpreting the test results, and/or designating which piles of concrete would be loaded onto Edgewood's trucks.

53.     Upon information and belief, Ford and/or Alberici also hired EQ to test the concrete at the Edison Site for contaminants and to stockpile, handle, test, and dispose of certain concrete.

54.     Edgewood entered into the First Contract in reliance on Ford, Alberici and J&L's representations that the concrete would be properly tested and that the concrete to be distributed to Edgewood would not exceed the RDCSCC criteria.

55.     Ford, Alberici, EQ, J&L, Golder and/or Arcadis knew that Edgewood intended to use the concrete as fill on its property development sites.

56.     Pursuant to the First Contract, Edgewood sent trucks to the Edison Plant to pick up the concrete.  Ford, Alberici, EQ, J&L, Golder and/or Arcadis were responsible for selecting and did select piles of concrete to be loaded onto Edgewood's trucks and loaded the concrete onto Edgewood's trucks.

57.     Although the First Contract specified that Ford was to provide Edgewood only concrete meeting the RDCSCC criteria, Ford, Alberici, EQ, J&L, Golder and/or Arcadis provided Edgewood with concrete exceeding the RDCSCC criteria.

58.     Under the First Contract, Edgewood transported concrete from the Edison Site to the following six New Jersey properties:

     1)      American Standard, Hamilton Township, a residential property development;

     2)      Commercial Avenue, New Brunswick, a residential and commercial property development;

     3)      Applegarth, Monroe Township, a commercial property development;

     4)      Laurelton Mobile Home Park, Brick Township, a residential property development;

     5)      West Windsor Township Site, West Windsor, a commercial property development; and

     6)      Tingley, South Plainfield, a proposed residential property development.

59.     In April 2005, unbeknownst to Edgewood, Ford determined that the First Contract was unlawful in that Ford did not possess the necessary permits to distribute the concrete.

60.     In April 2005, representatives and/or agents of Ford informed Edgewood that Ford could no longer transfer recycled concrete to Edgewood for re-use on Edgewood's properties under the terms of the First Contract and that Ford, EQ and Edgewood needed to negotiate a new contract in order for Ford to continue transferring recycled concrete to Edgewood.  Ford, EQ and Edgewood, therefore, began negotiating a second contract.

61.     As part of the negotiations of a second contract, in April 2005, representatives and/or agents of Ford caused Golder, Ford's environmental consultant, to provide ELM, Inc.,

Edgewood's environmental consultant, an April 27, 2005 memorandum stating that only those "stockpiles [of concrete] where the samples exhibited PCB concentrations below the unrestricted use cleanup criteria are currently being staged for potential re-use at appropriate off-site locations," while "stockpiles where the samples exhibited PCB concentrations above the unrestricted use criteria . . . are segregated and properly disposed off-site." Exhibit B.

62.    The April 27, 2005 memorandum was false, contained incomplete information, was misleading and created a false impression regarding the handling, staging, segregating and/or disposal of the stockpiles of concrete at the Site.

63.    Upon information and belief, Ford, Alberici, EQ, J&L, Golder and/or Arcadis provided Edgewood with the April 27, 2005 memorandum to reinforce the representation they had made to Edgewood – that Edgewood had received, and would continue to receive, concrete with PCB concentrations below the unrestricted use cleanup criteria.

64.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis intentionally, recklessly and/or negligently misrepresented that under the anticipated second contract, Edgewood would receive concrete not exceeding the RDCSCC criteria.

65.    By providing Edgewood the April 27, 2005 memorandum, Ford, Alberici, EQ, J&L, Golder and/or Arcadis provided Edgewood the April 27, 2005 memorandum intentionally, recklessly and/or negligently misrepresented that under the anticipated second contract, Edgewood would receive concrete not exceeding the RDCSCC criteria, while intentionally, recklessly and/or negligently providing Edgewood with concrete exceeding the RDCSCC criteria.

66.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis provided Edgewood with the April 27, 2005 memorandum and misrepresented that under the anticipated second contract,

11

Edgewood would receive concrete not exceeding the RDCSCC criteria, with the intention that Edgewood would rely upon this representation.

67.     As part of the negotiations of a second contract, representatives of Ford and/or EQ, including without limitation Mike Powell and Dave Ciroli, represented to representatives of Edgewood, including without limitation John Verlaque, Corporate Counsel for Edgewood, that the NJDEP oversaw decommissioning operations at the Edison Plant and had approved the distribution of Ford concrete to outside contractors for re-use offsite.

68.     As part of the negotiations of a second contract, representatives of Ford and/or EQ, including without limitation Mike Powell and Dave Ciroli, agreed to indemnify Edgewood for any damages incurred as a result of "any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material" or "any claims, damages or losses incurred because of [Edgewood's] handling of hazardous material at the Ford plant."

69.     In early June 2005, Edgewood entered into a second contract (the "Second Contract") with Ford's wholly-owned subsidiary FMLDC and EQ to obtain concrete that was "free of contamination" or had "contamination levels below commercial standards."  Exhibit C.

70.     Upon information and belief, Ford directed EQ to negotiate and execute the Second Contract with Edgewood and agreed to be a signatory to the Second Contract.

71.     Upon information and belief, Ford agreed to undertake certain obligations to Edgewood under the Second Contract, including without limitation to provide Edgewood access to the Edison Plant solely to pick up crushed concrete, to make concrete available for crushing and, ultimately, re-use offsite, and to pay for the crushing of concrete contemplated under the contract through payments to Alberici, EQ and/or Edgewood.

72.     The Second Contract is not a completely integrated document and is ambiguous and/or omits terms that were agreed to by the parties, including without limitation Ford's obligation to provide Edgewood access to the Edison Plant solely to pick up crushed concrete, to make concrete available to EQ and Edgewood for crushing and, ultimately, re-use offsite, and to pay for the crushing of concrete contemplated under the contract through payments to Alberici, EQ and/or Edgewood.

73.     Although Edgewood does not possess a copy of the Second Contract that has been signed by a Ford representative, all parties, including Ford, mutually assented to the terms of the Second Contract and Ford conducted itself as if the Second Contract were legally effective and binding, and performed obligations contemplated thereunder and agreed to by the parties, including without limitation providing Edgewood access to the Edison Plant solely to pick up crushed concrete, making concrete available to EQ and Edgewood for crushing and, ultimately, re-use offsite, and paying for the crushing of concrete contemplated under the contract through payments to Alberici, EQ and/or Edgewood.

74.     Pursuant to the Second Contract, on or about June 1, 2005, Edgewood filed a "Notification of Exempt Recycling Activities" with the NJDEP, Edison Township, and Middlesex County.

75.     Edgewood entered into the Second Contract and filed the Notification of Exempt Recycling Activities in reasonable reliance on representations by Ford and its contractors, Alberici, EQ and J&L, including those representations described above, that Edgewood would be receiving concrete not exceeding the RDCSCC criteria.

76.     Edgewood entered into the Second Contract and filed the Notification of Exempt Recycling Activities in reliance on representations by Ford and its contractors, Alberici, EQ and

J&L, including those representations described above, that the NJDEP oversaw decommissioning operations at the Edison Plant and had approved the distribution of Ford concrete to outside contractors for re-use.

77.     Under the terms of the Second Contract, EQ was responsible for testing the concrete provided by Ford for contamination, providing the results of such testing to Edgewood, removing or disposing of concrete with contamination above commercial levels, and obtaining the necessary licenses and permits to crush the concrete.  Exhibit C.  Upon information and belief, Ford, Alberici, Golder and/or Arcadis assisted and/or supervised EQ in the sampling, testing, stockpiling, labeling, and selection of concrete for distribution.

78.     The Second Contract further provided that FMLDC and EQ would indemnify Edgewood for any damages incurred as a result of "any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material" or "any claims, damages or losses incurred because of [Edgewood's] handling of hazardous material at the Ford plant."  Exhibit C.  Upon information and belief, Ford will indemnify EQ for any payments EQ makes to Edgewood under this indemnity.

79.     Edgewood entered into the Second Contract and filed the Notification of Exempt Recycling Activities in reasonable reliance on representations by Ford and EQ that Ford and EQ would indemnify Edgewood for any damages incurred as a result of "any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material" or "any claims, damages or losses incurred because of [Edgewood's] handling of hazardous material at the Ford plant."  Exhibit C.

80.     Upon information and belief, Ford, Alberici, EQ, J&L, Golder and/or Arcadis supervised the management and/or handling of the concrete and the operations of the crushing

14

contractor, Custom Crushing, who crushed concrete provided to Edgewood under the Second Contract.

81.    Pursuant to the Second Contract, Edgewood sent trucks to the Site to pick up the concrete.  Upon information and belief, Alberici, EQ, and/or J&L labeled, selected and loaded piles of concrete onto Edgewood's trucks for transport from the Edison Plant.  Upon information and belief, Ford, Golder and/or Arcadis reviewed sampling data for the piles and/or supervised Alberici, EQ, and J&L's labeling and selecting of the piles for distribution and loading.

82.    At no time, under the First Contract or the Second Contract, did Edgewood ever select which piles of concrete it would take, because only Ford, Alberici, EQ, J&L, Golder, and/or Arcadis knew which piles of concrete met the RDCSCC criteria and which did not.

83.    Upon information and belief, Custom Crushing, the entity hired by EQ to crush concrete received by Edgewood under the Second Contract, was never told by Ford, Alberici, EQ, J&L, Golder, or Arcadis that the concrete it was crushing contained contaminants, including PCBs.

84.    Under the Second Contract, Edgewood transported concrete to the following seven New Jersey properties (the "Properties"):

1)    American Standard, Hamilton Township, a residential property development;

2)    Commercial Avenue, New Brunswick, a residential and commercial property development;

3)    Applegarth, Monroe Township, a commercial property development;

4)    Laurelton Mobile Home Park, Brick Township, a residential property development;

5)    West Windsor Township Site, West Windsor, a commercial property development;

   6)  Tingley, South Plainfield, a proposed residential property development; and

   7)  Brick 70, Brick Township, a commercial property development.

85. On or about June 23, 2005, Edgewood discovered that the concrete that Ford, Alberici, EQ and/or J&L supplied under both the First Contract and the Second Contract exceeded the RDCSCC criteria for PCBs and other contaminants and, in numerous instances, exceeded the NRDCSCC criteria.  As a result, Edgewood refused to take any additional concrete from Ford and demanded that Ford immediately clean up and remove contaminated concrete from the Properties.

86. Since June 2005, Edgewood has incurred and continues to incur response costs in excess of $750,000 associated with the investigation, monitoring, clean up, removal and/or replacement of concrete from the Properties.  In addition, Edgewood has suffered tens of millions of dollars in damages as well as reputational harm as a result of the events alleged herein.

87. In the fall of 2005, Ford and EQ began the removal of the concrete from the Applegarth (Monroe Township), Tingley (South Plainfield) and West Windsor (West Windsor Township) properties.

88. On March 3, 2006, the NJDEP served Ford with a Notice of Violation for: (1) operating an unpermitted solid waste facility at the former Edison Assembly Plant by processing solid waste in the form of contaminated concrete rubble without the necessary approvals; and (2) depositing solid waste "at redevelopment sites not authorized to accept such material."  Exhibit D.

89. On March 8, 2006, the NJDEP issued an Administrative Order directing that Ford, FMLDC, Alberici, and Edgewood remediate the Properties.

90.     In 2006, Ford began the removal of the concrete from the American Standard (Hamilton Township), Commercial Avenue (New Brunswick), Laurelton Mobile Home Park (Brick Township), and Brick 70 (Brick Township) properties.

91.     In the fall of 2006, Ford abruptly abandoned its remediation activities at the Properties, causing Edgewood to incur substantial response costs to continue and, for some properties, complete the remediation activities that Ford had abandoned.

92.     Ford's sampling results submitted to the NJDEP in connection with the remediation of the Properties confirms that the concrete provided under the First Contract and Second Contract exceeds both the RDCSCC criteria and the NRDCSCC criteria.

93.     Upon information and belief, Tetra Tech, the consultant hired by Ford in late 2005 to locate, test and remove concrete distributed from the Edison Plant has employed a more rigorous and reliable sampling method than the method used by Ford, Alberici, EQ, J&L, Golder and/or Arcadis to test concrete for PCB contamination before distributing it from the Edison Plant.

94.     On or about March 8, 2006, the NJDEP ordered Edgewood to stop construction on all of the Properties because they were and are contaminated, resulting in tens of millions of dollars of damages as well as harm to Edgewood's reputation.  Edgewood was and is unable in some instances to resume construction at the Properties until authorized by the NJDEP.  As a result of the events alleged herein, Edgewood has suffered, among other damages, significant construction delays, additional carrying costs, including without limitation mortgage, tax and insurance payments, and lost rental income.

95.     To date, Edgewood has completed the removal of all Ford concrete from the American Standard (Hamilton Township) property, and the NJDEP has issued a No Further Action ("NFA") letter, indicating that no further action is required at the property.

96.     To date, Edgewood has completed the removal of all Ford concrete from the Commercial Avenue (New Brunswick), Laurelton Mobile Home Park (Brick Township), Tingley (South Plainfield), and Brick 70 (Brick Township) properties; however, the NJDEP has not yet issued NFA letters for these properties, and thus damages continue to accrue.

97.     To date, the Applegarth (Monroe Township) and West Windsor (West Windsor Township) properties have not been completely remediated, and thus damages continue to accrue.

## COUNT I

### New Jersey Spill Act

98.     Edgewood repeats and realleges the allegations contained in paragraphs 1 through 97 as if fully set forth herein.

99.     New Jersey's Spill Act provides that

> [w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

N.J.S.A. 58:10-23.1 1f(a)(2)(a).

100.     The Spill Act further provides:

> In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.

N.J.S.A. 58:10-23.1 1f(a)(2)(a).

101.   "Discharges" within the meaning of N.J.S.A. 58:10-23.1 1b(h) have occurred at the Properties.

102.   "Hazardous substances" within the meaning of N.J.S.A. 58:10-23.1 1b(k) have been discharged at the Properties.

103.   J&L, Golder and Arcadis are each a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of N.J.S.A. 58:10-23.1 1f(a)(2)(a).

104.   Edgewood has incurred costs associated with the remediation of the Properties.

105.   Edgewood, at its own expense, has cleaned up and removed hazardous waste from the American Standard (Hamilton Township), Commercial Avenue (New Brunswick),West Windsor Township Site, Tingley (South Plainfield), and Applegarth (Monroe Township) sites.

106.   Ford's distribution of contaminated concrete to Edgewood without the proper permits and approval letters was illegal and in breach of the Second Contract.  Exhibit D.

107.   In assisting Ford with the improper and illegal distribution of contaminated concrete to Edgewood, Alberici, EQ J&L, Golder and Arcadis failed to properly and adequately test the concrete; failed to notify federal, state, and local authorities that the concrete was contaminated; failed to request the proper permits to transfer the concrete to Edgewood; failed to track the concrete; failed to properly stockpile, categorize, and segregate the concrete; failed to properly dispose of the concrete; represented that the concrete was suitable for re-use in residential and commercial developments; selected and loaded concrete onto Edgewood's trucks that exceeded the RDCSCC and/or NRDCSCC criteria; failed to supervise subcontractors and employees responsible for handling, testing, stockpiling, and designating concrete to be loaded

onto Edgewood's trucks; represented that the concrete did not contain contaminants exceeding the RDCSCC criteria; represented that the NJDEP approved of the handling and distribution of concrete; failed to comply with NJDEP regulations applicable to the distribution of the concrete; and otherwise failed to act in accordance with New Jersey laws and regulations.

108.    Based on the conduct of J&L, Golder and Arcadis described herein, the costs of remediating the Properties should be equitably apportioned to J&L, Golder and Arcadis under the Spill Act.

109.    Pursuant to N.J.S.A. 58:10-23.1 1f(a)(2), Edgewood is entitled to contribution from J&L, Golder and Arcadis, and all remediation costs which Edgewood has or will incur should be allocated to J&L, Golder and Arcadis, using such equitable facts as the Court deems appropriate.

**COUNT II**

**CERCLA Cost Recovery**

110.    Edgewood repeats and realleges the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

111.    "Releases" to the "environment" within the meaning of 42 U.S.C. §§ 9601(8) and (22) have occurred at the Properties.

112.    "Hazardous substances" within the meaning of 42 U.S.C. § 9601(14) have been released at the Properties.

113.    The "releases" occurred at a "facility," the Properties, within the meaning of 42 U.S.C. § 9601(9).

114.    J&L, Golder and/or Arcadis arranged for disposal or treatment of hazardous substances, PCB-contaminated concrete, at the Properties under 42 U.S.C. § 9607(a)(3).

115.    As a result of the releases of PCB-contaminated concrete, Edgewood has incurred response costs associated with the remediation of the Properties.

116.    Edgewood, at its own expense, has cleaned up and removed hazardous waste from the American Standard (Hamilton Township), Commercial Avenue (New Brunswick), West Windsor Township Site, Tingley (South Plainfield), and Applegarth (Monroe Township) sites.

117.    Edgewood's actions to clean up and remove hazardous waste from the Properties constitute "response" actions under 42 U.S.C. § 101(25).

118.    Edgewood's "response" actions and associated costs were and are consistent with the National Contingency Plan.

119.    J&L, Golder and Arcadis's distribution of contaminated concrete to Edgewood without the proper permits and approval letters was illegal, in breach of the First Contracts and Second Contracts, and J&L, Golder and Arcadis's misrepresentations regarding the quality of the concrete were fraudulent.  Exhibit D.

120.    J&L, Golder and Arcadis are jointly and severally liable for all response costs incurred by Edgewood.

**<u>COUNT III</u>**

**Common Law Strict Liability**

121.    Edgewood repeats and realleges the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

122.    J&L, Golder and Arcadis, in decommissioning contaminated property and handling and distributing  contaminated concrete in violation of the law and/or concealing knowledge of the extent of contamination of such concrete, have engaged in abnormally

dangerous, ultrahazardous, and inherently or intrinsically dangerous activities for which they are strictly liable to Edgewood.

123.     These abnormally dangerous activities involve a high degree of risk of some harm to the person or land of another; the likelihood that the harm resulting from it will be great, and the risk cannot be eliminated by the exercise of reasonable care.

124.     J&L, Golder and Arcadis's activities were not a matter of common usage, were inappropriate to the place where they were carried on, and their value to the community was outweighed by their dangerous attributes.

125.     As a direct and proximate result of J&L, Golder and Arcadis's commission of such abnormally dangerous activities, Edgewood has suffered damages in an amount to be determined at trial.

## COUNT IV

### Negligent Misrepresentation

126.     Edgewood repeats and realleges the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.     In decommissioning the Edison Plant with knowledge that Ford and its agents would be transferring recycled concrete to third parties like Edgewood, J&L and Golder owed Edgewood a duty of care to comply with all federal, state, and local laws relating to the transfer and use of recycled concrete and to otherwise manage the crushing, handling, testing, stockpiling, transfer, and disposal of the concrete in a reasonable and safe manner and/or to disclose hidden defects in the concrete of which J&L and Golder was or should have been aware, but recklessly and/or negligently disregarded.

22

128.    J&L and Golder breached this duty of care by, among other things, negligently misrepresenting to Edgewood the quality of the concrete that Ford intended to provide Edgewood.

129.    On or about February 23, 2005, Ford entered into the First Contract (described above) to provide crushed concrete containing specified levels of contamination to Edgewood. Edgewood incorporates by reference paragraphs 42 through 57, describing the negotiation and negligent misrepresentations made to Edgewood.

130.    On or about June 1, 2005, Ford and EQ entered into the Second Contract (described above) to provide crushed concrete containing specified levels of contamination to Edgewood.   Edgewood incorporates by reference paragraphs 59 through 82, describing the negotiation and negligent misrepresentations made to Edgewood.

131.    J&L and Golder's misrepresentations as to the quality of the concrete Ford sought to provide Edgewood were material.

132.    J&L and Golder's misrepresentations as to the quality of the concrete Ford sought to provide Edgewood were false because Ford provided Edgewood with concrete exceeding the RDCSCC criteria.

133.    J&L and Golder knew or had reason to know that Edgewood desired representations as to the quality of the concrete and that Edgewood intended to rely on J&L and Golder's representations regarding the quality of the concrete for the purpose of entering into the First Contract and Second Contract.

134.    J&L and Golder knew or had reason to know that if its representations were false or erroneous, Edgewood would sustain injuries, damages, and losses.

135.     In reasonable reliance on J&L and Golder's misrepresentations regarding the quality of the concrete, Edgewood entered into the First Contract with Ford and the Second Contract with Ford and EQ.

136.     Edgewood's reliance on J&L and Golder's misrepresentations was reasonable.

137.     At the time that J&L and Golder made their misrepresentations to Edgewood and Edgewood reasonably relied upon them, Edgewood did not know the misrepresentations were false.

138.     As a direct and proximate result of J&L and Golder's negligent misrepresentations, Edgewood has suffered damages in an amount to be determined at trial.

## COUNT V

### Negligence

139.     Edgewood repeats and realleges the allegations contained in paragraphs 1 through 138 as if fully set forth herein.

140.     In decommissioning the Edison Plant with knowledge that Ford and its agents would be transferring recycled concrete to third parties like Edgewood, J&L, Golder and Arcadis owed Edgewood a duty of care to comply with all federal, state, and local laws relating to the transfer and use of recycled concrete and to otherwise manage the crushing, handling, testing, stockpiling, transfer, and disposal of the concrete in a reasonable and safe manner.

141.     J&L, Golder and Arcadis breached this duty of care by, among other things: failing to properly and adequately test the concrete; failing to notify federal, state, and local authorities that the concrete was contaminated; failing to request the proper permits to transfer the concrete to Edgewood; failing to track the concrete; failing to properly stockpile, categorize, and segregate the concrete; failing to properly dispose of the concrete; representing that the

concrete was suitable for reuse in residential and commercial developments; selecting concrete for Edgewood to remove from the Edison Site that exceeded the RDCSCC and/or NRDCSCC criteria; failing to supervise subcontractors and employees responsible for testing, stockpiling, and designating concrete to be transferred to Edgewood; representing that the concrete did not contain contaminants exceeding the RDCSCC criteria; representing that the NJDEP approved of the handling and distribution of concrete; failing to comply with NJDEP regulations applicable to the distribution of the concrete; and otherwise failing to act in accordance with the proper standard of care.

142.    As a direct and proximate result of J&L, Golder and Arcadis's breach of the duty of care owed to Edgewood, Edgewood suffered damages in an amount to be determined at trial.

## COUNT VI

### Civil Conspiracy

143.    Edgewood repeats and realleges the allegations contained in paragraphs 1 through 142 as if fully set forth herein.

144.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis conspired to commit a fraud on Edgewood by entering into a conspiratorial agreement to induce Edgewood to enter into contracts to obtain concrete by knowingly misrepresenting to Edgewood the quality of the concrete that Edgewood was to be provided as described below and throughout this complaint.

145.    In particular, in early February 2005, Frank Sellinger, an employee of Edgewood, met with Ford, Alberici and J&L representatives and/or agents, including Marty Huffman, in a trailer at the Edison Plant located on US 1 in Edison Township, New Jersey.

146.    At the meeting referenced in paragraph 146, immediately above, representatives and/or agents of Ford, Alberici and J&L, including Marty Huffman, discussed providing Edgewood with concrete *meeting the RDCSCC criteria* from the Edison Plant.

147.    At the meeting referenced in paragraph 146 above, representatives and/or agents of Ford, Alberici and J&L, including Marty Huffman, explained the concrete stockpiling and testing methods used at the Edison Plant and explained that concrete containing contaminants in excess of the RDCSCC criteria would *not* be distributed to Edgewood.

148.    On or about February 23, 2005, Sellinger again met with representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway, at the Edison Plant located on US 1 in Edison Township.

149.    At the meeting referenced in paragraph 149 immediately above, Mike Powell, Marty Huffman and Chris Hemingway personally showed Sellinger maps of the Edison Site containing boring locations and represented that Ford was distributing concrete only from uncontaminated locations of the Plant.

150.    At the meetings referenced in paragraphs 146 and 149 above, representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway knowingly misrepresented that they would provide Edgewood concrete containing contaminants not exceeding the RDCSCC, while intending to provide Edgewood with concrete containing contaminants exceeding the RDCSCC criteria.

151.    At the meetings referenced in paragraphs 146 and 149 above, representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway, knowingly misrepresented that they would provide Edgewood concrete

containing contaminants not exceeding the RDCSCC criteria with the intention that Edgewood would rely upon this representation.

152.    Edgewood reasonably relied on the misrepresentations made by representatives and/or agents of Ford, Alberici, J&L and Golder, including Mike Powell, Marty Huffman and Chris Hemingway at the meetings referenced in paragraphs 146 and 149 above.

153.    On February 23, 2005, Edgewood entered into the First Contract with Ford, whereby Ford agreed to supply Edgewood with 50,000 cubic yards of crushed concrete from the Edison Plant "containing constituents below NJDEP unrestrictive use criteria," i.e., below RDCSCC criteria.  Exhibit A.

154.    In April 2005, representatives and/or agents of Ford caused Golder, Ford's environmental consultant, to provide ELM, Inc., Edgewood's environmental consultant, an April 27, 2005 memorandum stating that only those "stockpiles [of concrete] where the samples exhibited PCB concentrations below the unrestricted use cleanup criteria are currently being staged for potential re-use at appropriate off-site locations," while "stockpiles where the samples exhibited PCB concentrations above the unrestricted use criteria . . . are segregated and properly disposed off-site." Exhibit B.

155.    Ford, Alberici, EQ, J&L, and/or Golder provided Edgewood the April 27, 2005 memorandum knowingly misrepresenting that, under the Second Contract, Edgewood would receive concrete not exceeding the RDCSCC criteria, while intending to provide Edgewood with concrete exceeding the RDCSCC criteria.

156.    Ford, Alberici, EQ, J&L and/or Golder provided Edgewood the April 27, 2005 memorandum misrepresenting that under the Second Contract, Edgewood would receive

concrete not exceeding the RDCSCC criteria, with the intention that Edgewood would rely upon this representation.

157.    Edgewood reasonably relied upon the misrepresentations in the April 27, 2005 memorandum.

158.    Ford authorized, was complicit in and/or ratified the conduct of its representatives and/or agents.

159.    Ford, Alberici, EQ, J&L and/or Golder's misrepresentations as to the quality of the concrete Ford sought to provide Edgewood were material.

160.    Ford, Alberici, EQ, J&L and/or Golder's misrepresentations as to the quality of the concrete Ford sought to provide Edgewood were false because Ford, Alberici, EQ, J&L and/or Golder knew and/or recklessly disregarded that the concrete to be distributed to Edgewood from the Edison Plant exceeded the RDCSCC criteria.

161.    Ford, Alberici, EQ, J&L and/or Golder knew their misrepresentations regarding the quality of the concrete were false at the time Ford, Alberici, EQ, J&L and/or Golder made the misrepresentations.

162.    Ford, Alberici, EQ, J&L and/or Golder made their misrepresentations regarding the quality of the concrete with the specific purpose of inducing Edgewood to rely upon them.

163.    In reliance on Ford, Alberici, EQ, J&L and/or Golder's misrepresentations regarding the quality of the concrete, Edgewood entered into the First Contract with Ford and Second Contract with Ford and EQ.

164.    Edgewood's reliance on Ford, Alberici, EQ, J&L and/or Golder's misrepresentations was reasonable.

165.    At the time that Ford, Alberici, EQ, J&L and/or Golder made their misrepresentations to Edgewood and Edgewood reasonably relied upon them, Edgewood did not know the misrepresentations were false.

166.    The conduct of Ford, Alberici, EQ, J&L, Golder and/or Arcadis in the handling, testing and/or distribution of contaminated concrete, or concealment of knowledge of same, constituted willful and wanton disregard of the rights, welfare, safety and health of Edgewood and others, including but not limited to residents of New Jersey.  Ford, Alberici, EQ, J&L, Golder and/or Arcadis caused and continue to cause injury and damages to Edgewood and others through intentional acts and omissions, including without limitation fraud, accompanied by a willful and wanton disregard of persons like Edgewood who foreseeably might be harmed by such acts or omissions.

167.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis reached agreement to act in concert to handle, test and/or distribute contaminated concrete to Edgewood and others while failing to warn such parties about the actual extent of the contamination and its associated dangers.  Ford, Alberici, EQ, J&L, Golder and/or Arcadis reached agreement to act in concert to induce Edgewood and others to remove contaminated concrete from the Edison Plant in such a manner as to mask the actual extent of the contamination, thereby enabling Ford, Alberici, EQ, J&L, Golder and/or Arcadis to avoid taking appropriate steps to properly and legally handle, test and dispose of such contaminated concrete and paying the increased costs associated with such proper and legal handling, testing and disposal.  Moreover, Ford, Alberici, EQ, J&L, Golder and/or Arcadis conspired and worked together to commit overt acts in furtherance of the conspiracy, including without limitation:  concealing the extent of the contamination in the concrete distributed to Edgewood and others; misleading Edgewood and others about the actual

extent of such concrete contamination; and unlawfully distributing contaminated concrete to Edgewood and others for re-use at the Properties and other locations that were not authorized to receive such contaminated concrete.  Acting in concert to effect these unlawful and wrongful acts and omissions, Ford, Alberici, EQ, J&L, Golder and/or Arcadis inflicted damages upon Edgewood and others.

168.    The conduct of Ford, Alberici, EQ, J&L, Golder and/or Arcadis in the handling, testing and/or distribution of contaminated concrete, or concealment of knowledge of same, that have caused or threaten to cause injury or damage were deliberate acts or omissions taken with knowledge of a high degree of probability of harm and/or reckless indifference to the consequences thereof, and the welfare of Edgewood and others.

169.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis's conduct in the handling, testing and/or distribution of contaminated concrete, or concealment of knowledge of same, that have caused or threaten to cause injury or damage demonstrated a willful and wanton, malicious and reckless disregard of the rights of Edgewood and others as to warrant imposition of punitive damages, pursuant to N.J.S.A. 2A:15-5.10 *et seq*.

170.    As a direct and proximate result of Ford, Alberici, EQ, J&L, Golder and/or Arcadis's acts and omissions as set forth herein, Edgewood has suffered damages in an amount to be determined at trial.

## COUNT VII

## NJ RICO STATUTE

171.    Edgewood repeats and realleges the allegations contained in paragraphs 1 through 170 as if fully set forth herein.

172.    Ford, EQ, Alberici, J&L, Golder and Arcadis formed an enterprise with the intent of distributing concrete that they knew was contaminated in violation of environmental regulations.  Ford, EQ, Alberici, J&L, Golder and Arcadis schemed to distribute this concrete (and transmitted their repeated false statements that perpetrated this scheme through the wires and mails) so as to avoid incurring the costs (likely to be in the hundreds of millions of dollars) of disposing of this material properly and in compliance with law.  Thus, they were able to profit substantially all the while knowing that the concrete was not environmentally sound.  In order to perpetrate this scheme, Ford, EQ, Alberici, J&L, Golder and Arcadis engaged in multiple fraudulent and illegal acts to conceal the true contamination level of the concrete, all to induce Edgewood into accepting it (notwithstanding Edgewood's statements to Ford and to its fellow members of the RICO enterprise, that Edgewood required concrete fill that was usable at its development sites).  Edgewood then, in reliance on the statements and conduct of Ford and the other members of the RICO enterprise, used the concrete as fill at the Properties, without knowing it was not in compliance with applicable environmentally regulations and law.  Edgewood has now incurred substantial costs to pay for the remediation of the Properties and substantial damages as the result of having unknowingly used contaminated fill.

### A.    The Enterprise

173.    Ford, EQ, Alberici, J&L, Golder and Arcadis are "persons" as that term is defined in N.J.S.A. 2C:41-1(b).

174.    Ford, EQ, Alberici, J&L, Golder and/or Arcadis comprise an "Enterprise" within the meaning of N.J.S.A. 2C:41-1(c).

175.    The Enterprise has an existence beyond that which is merely necessary to commit predicate acts.

176.    The Enterprise oversaw and coordinated the commission of numerous predicate acts on an ongoing basis in furtherance of the scheme to defraud Edgewood and others and to unlawfully distribute contaminated concrete.

177.    The Enterprise was operated, managed, and controlled by Ford, EQ, Alberici, J&L, Golder, and/or Arcadis.

178.    Each member of the Enterprise participated directly and/or indirectly in the conduct of the affairs of the Enterprise by agreeing to defraud, or to aid other members of the Enterprise in defrauding, Edgewood and others, and to unlawfully distribute, or to aid other members of the Enterprise in unlawfully distributing, contaminated concrete.

179.    As evidence of its intentional scheme to defraud Edgewood and others and to unlawfully distribute contaminated concrete, the Enterprise divided various tasks among its members to effectuate its unlawful purpose.

180.    Ford owned and/or controlled the concrete located at the Edison Plant.  As part of its ownership and control of the concrete, Ford had the authority to determine how the concrete would be disposed, the sampling methodology for testing the concrete, the protocol for handling the concrete, how the concrete would be described to third parties, and to whom the concrete would be distributed.

181.    Ford hired Alberici to serve as the general contractor in charge of decommissioning the Edison Plant.  As the general contractor, Alberici also had control of decommissioning operations at the Edison Plant, including the generation of concrete from the Edison Plant.  As general contractor, Alberici hired and was responsible for supervising subcontractors who handled, stockpiled, sampled, loaded and distributed the concrete.

182.    Ford and/or Alberici hired EQ to facilitate the proper disposal of waste streams from the Edison Plant.  As part of its role, EQ had control of the concrete and the authority to direct its proper disposal.  This authority is demonstrated by the Second Contract, whereby EQ agreed to transfer Ford's concrete to Edgewood.

183.    Alberici hired J&L to serve as its demolition subcontractor.  As the demolition subcontractor, J&L was involved in crushing, stockpiling, and loading concrete at the Edison Plant.

184.    Ford hired Golder to provide assistance with the coordination and management of environmental compliance work at the Edison Plant.  In this role, Golder was responsible for ensuring that the decommissioning of the Edison Plant was conducted in accordance with project specifications and NJDEP requirements.  As described in sworn testimony submitted to this Court by Kevin Baumann, Alberici's project manager at the Edison Plant, Golder was responsible for deciding (a) what level of contaminated concrete could/would be used as backfill on the Edison Plant; (b) how to sample the concrete for the existence of PCBs; and (c) how and when to label and consolidate piles of crushed concrete.  *See* Declaration of Kevin Baumann ¶ 3 [Dkt. No. 66].  As part of this authority, Golder issued various work directives relating to the concrete at issue, such as memoranda dated January 27, 2005 and April 27, 2005, specifying the sampling methodology for the concrete.

185.    Ford hired Arcadis to assist Ford with its obligations under ISRA.  As described in sworn testimony submitted to this Court by Kevin Baumann, Alberici's project manager at the Edison Plant, Arcadis was also responsible for deciding (a) what level of contaminated concrete could/would be used as backfill on the Edison Plant; (b) how to sample the concrete for the

existence of PCBs; and (c) how and when to label and consolidate piles of crushed concrete. *See* Declaration of Kevin Baumann ¶ 3 [Dkt. No. 66].

186.   As explained by Baumann, Golder and Arcadis, the supervising environmental consultants on-site at the Edison Plant, intentionally, knowingly and/or recklessly proposed deficient sampling and distribution plans which resulted in the unlawful distribution of contaminated concrete to Edgewood and other parties. *See* Declaration of Kevin Baumann ¶ 3 [Dkt. No. 66]. These sampling and distribution plans were adopted and ratified by Ford, Alberici, EQ, and J&L.

187.   Ford, Alberici, EQ, J&L, Golder, and Arcadis each played an integral role in the Enterprise in that each of them were involved in, or supervised, one or more aspects of selling, crushing, sampling, testing, handling, stockpiling, labeling, and/or loading the concrete that was distributed to Edgewood and others.

188.   Although Ford, Alberici, EQ, J&L, Golder, and Arcadis may have possessed various levels of expertise with regard to environmental rules and regulations, each of these parties knew that it was unlawful to distribute contaminated concrete for placement on private property developments, absent NJDEP approval.

     **B.**    **The Purpose of the Enterprise**

189.   As described herein, Ford, Alberici, Golder and/or Arcadis intended to use onsite the crushed concrete that would be generated from demolishing Edison Plant buildings and floor slabs.

190.   However, testing revealed that 50% or more of the concrete slabs contained PCBs, rendering them unusable for onsite re-use.

191.    This posed two significant problems for the decommissioning:  1) Ford and/or Alberici would have to incur the cost of buying clean fill to use onsite; and 2) Ford and/or Alberici would have to pay to transport and dispose of the contaminated concrete at a proper disposal facility subject to the restrictions imposed by New Jersey law.

192.    In addition, the contaminated concrete was a point of dispute between Ford and Alberici.  Alberici contended that the testing and disposal of the contaminated concrete was outside the scope of its contract because the extent of the PCB contamination was not addressed in the project bid documents.

193.    In order to avoid a dispute over the proper scope of Alberici's contract, Alberici and Ford, with guidance from EQ, Golder, and Arcadis, sought an inexpensive way to dispose of the contaminated concrete.

194.    Faced with the significant costs of legally disposing of the contaminated concrete, Ford, Alberici, Golder and Arcadis, with the agreement of and/or assistance from EQ and J&L, decided to distribute the concrete to Edgewood and other parties, in intentional and deliberate contravention of the NJDEP's November 9, 2004 letter requiring Ford to properly dispose of any concrete containing PCBs.

**C.    The Pattern of Racketeering Activity**

195.    Beginning in at least January 2005 and continuing through at least August 2005, and in furtherance of the scheme to defraud Edgewood and others and to unlawfully distribute concrete containing PCBs and other contaminants, Ford, EQ, Alberici, J&L, Golder, and/or Arcadis knowingly and intentionally conducted or participated in the Enterprise's affairs through a pattern of racketeering activity.

196.    As part of this pattern of racketeering activity, on or about January 13, 2005, Ford entered into a contract to provide crushed concrete, containing specified levels of contaminants, to Northeast Developers, Inc. ("Northeast").   The contract provided that the concrete would be shipped through J&L, EQ, and Alberici.   Upon information and belief, Northeast received approximately 1,500 tons of concrete containing contaminants from the Edison Plant.

197.    On or about January 18, 2005, Ford entered into a contract to provide crushed concrete, containing specified levels of contaminants, to North Creek CCC ("North Creek"). The contract provided that the concrete would be shipped through J&L, EQ, and Alberici.   Upon information and belief, North Creek received approximately 3,300 tons of concrete containing contaminants from the Edison Plant.

198.    On or about February 23, 2005, Ford entered into the First Contract (described above) to provide crushed concrete, containing specified levels of contaminants, to Edgewood. The contract provided that the concrete would be shipped through J&L, EQ, and Alberici.   As described herein, pursuant to the First Contract, Edgewood received and transported thousands tons of concrete to six of its property developments.   Edgewood incorporates herein by reference paragraphs 42 through 57, describing the negotiation and execution of the First Contract.

199.    On or about March 21, 2005, Ford entered into a contract to provide crushed concrete, containing specified levels of contaminants, to Fisher Contracting, Inc.   The contract provided that the concrete would be shipped through J&L, EQ, and Alberici.

200.    On or about June 1, 2005, Ford and EQ entered into the Second Contract (described above) to provide concrete, containing specified levels of contaminants, to Edgewood. As described herein, pursuant to the Second Contract, Edgewood received and transported thousands of tons of concrete to seven of its property developments.   Edgewood incorporates

36

herein by reference paragraphs 59 through 82, describing the negotiation and execution of the Second Contract.

201. On or about August 9, 2005, EQ entered into a contract to provide concrete, containing specified levels of contaminants, to Caruso Excavating Co., Inc. ("Caruso"). Pursuant to this contract, Caruso obtained concrete from the Edison Plant and transported it to certain of its properties.

202. All of the foregoing contracts violated New Jersey statutes, rules, and regulations regarding the disposal of contaminated materials.

203. Upon information and belief, National Crushing, the entity hired by Ford and/or Alberici to crush concrete from approximately November 2004 to April 2005, was never told by Ford, Alberici, EQ, J&L, Golder, or Arcadis that the concrete it was crushing contained contaminants, including PCBs.

204. Upon information and belief, Custom Crushing, the entity hired by EQ to crush concrete received by Edgewood under the Second Contract, was never told by Ford, Alberici, EQ, J&L, Golder, or Arcadis that the concrete it was crushing contained contaminants, including PCBs.

205. Upon information and belief, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis intentionally and/or recklessly withheld information about potential contamination from the crushing contractors, because, if the crushers had known of the contamination, they would have been required by law to employ mitigation techniques to, among other things, prevent contaminants from impacting their employees and disbursing to other areas of the Site and to the surrounding communities, resulting in significant additional costs to Ford, Alberici, EQ, J&L, Golder, and/or Arcadis.

206.    Upon information and belief, the foregoing crushing operations occurring at the Edison Plant and supervised by Ford, Alberici, EQ, J&L, Golder, and/or Arcadis violated New Jersey statutes, rules, and regulations regarding the crushing of contaminated materials.

207.    On March 3, 2006, the NJDEP served Ford with a Notice of Violation for:  (1) operating an unpermitted solid waste facility at the former Edison Assembly Plant by processing solid waste in the form of contaminated concrete rubble without the necessary approvals; and (2) depositing solid waste "at redevelopment sites not authorized to accept such material."  Exhibit D.

208.    Upon information and belief, in negotiating and performing under the foregoing contracts, Ford and/or EQ fraudulently concealed and/or misrepresented the contamination, the nature of the contamination, and/or the extent of the contamination of the concrete, with the intention that Edgewood and others would rely upon such fraudulent concealment and/or misrepresentations.

209.    Edgewood and, upon information and belief, other third parties, reasonably relied on the fraudulent concealment and/or misrepresentations regarding the contamination, the nature of the contamination, and/or the extent of the contamination of the concrete.

210.    In entering into and performing under the foregoing contracts in furtherance of the scheme to defraud Edgewood and others and to unlawfully distribute contaminated concrete, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis committed "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity" and therefore constituted a "pattern of racketeering" within the meaning of N.J.S.A. 2C:41-1(d)(2).

211.    As set forth above, this pattern consisted of repeated continuous acts that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated events, within the meaning of N.J.S.A. 2C:41-1(d)(2).

### D.     The Intentional Nature of the Pattern of Racketeering Activity

212.    It was the purpose of the Enterprise to defraud Edgewood and others and to unlawfully distribute contaminated concrete, in order to avoid the cost of complying with environmental laws and regulations, including the significant expense of properly and lawfully handling, testing, and disposing of contaminated concrete, to create and disseminate false and misleading information regarding such concrete, and to conceal knowledge of the same, with the objective of profiting from the enterprise at the expense of the recipients of such concrete, including Edgewood.

213.    This scheme was intended to, and did, allow Ford, Alberici, EQ, J&L, Golder, and/or Arcadis to profit through the avoidance of significant expenses to comply with environmental laws and regulations and to properly and lawfully handle, test, and dispose of contaminated concrete.  The Enterprise operated by Ford, Alberici, EQ, J&L, Golder and/or Arcadis achieved these objectives by the conduct of racketeering activity described herein.

### E.     The Conduct of the Enterprise is Prohibited "Racketeering Activity"

214.    In engaging in the foregoing activities, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis engaged in at least two predicate acts defined as "racketeering activity" under N.J.S.A. 2C:41-1, including:

    (a)     N.J.S.A. 2C:21-16 (Securing execution of documents by deception);

(b)     N.J.S.A. 2C:21-7(A)(d) (Selling or offering for sale adulterated or mislabeled commodities);

(c)     18 U.S.C. § 1341 (federal mail fraud statute); and

(d)     18 U.S.C. § 1343 (federal wire fraud statute).

**a.     The Pattern of Racketeering Activity Violated N.J.S.A. 2C:21-16**

215.    N.J.S.A. 2C:21-16 provides that "[a] person commits a crime of the fourth degree if by deception as to the contents of the instrument, he causes or induces another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person."

216.    As described in paragraphs 144 through 165, which are incorporated herein, Ford, Alberici, EQ, J&L, Golder and/or Arcadis induced Edgewood to enter into the First Contract and the Second Contract, which detrimentally affected Edgewood's pecuniary interest.

**b.     The Pattern of Racketeering Activity Violated 2C:21-7(A)(d)**

217.    Pursuant to N.J.S.A. 2C:21-7(A)(d), it is a criminal offense to "[s]ell[], offer[] or expose[] for sale adulterated or mislabeled commodities."

218.    Pursuant to the N.J.S.A. 2C:21-7, "adulterated" is defined as "varying from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage."

219.    The concrete distributed by Ford, Alberici, EQ, J&L, Golder, and/or Arcadis to Edgewood and others was and is "adulterated" because it "var[ies] from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage."

220.    Indeed, on March 3, 2006, the NJDEP issued a Notice of Violation against Ford, for distributing its contaminated (i.e. "adulterated") concrete to various property developments in New Jersey, rather than to facilities designated to receive contaminated concrete.

221.    Beginning in at least January 2005 and continuing through at least August 2005, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis knowingly and intentionally sold, offered, and/or exposed for sale "adulterated" concrete.

222.    Upon information and belief, concrete that was distributed pursuant to the agreements referenced in paragraphs 196 through 201 above was "adulterated" in violation of N.J.S.A. 2C:21-7.

### c.    The Pattern of Racketeering Activity Violated 18 U.S.C. §§ 1341 and 1343

223.    18 U.S.C. § 1341 prohibits the use of the United States mail for the purpose of carrying out a fraud.

224.    18 U.S.C. § 1343 prohibits the use of the wires for the purpose of carrying out a fraud.

225.    Ford, Alberici, EQ, J&L, Golder, and/or Arcadis used the United States mails and wires in furtherance of and to effectuate their fraudulent scheme as described herein.

226.    Beginning at least as early as December 2004, and continuing until at least August of 2005, in furtherance of and for the purpose of executing and attempting to execute the described scheme, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis each, on numerous occasions, used and foreseeably caused to be used United States mail and wire communications in interstate and foreign commerce.  These mail and wire communications were made, *inter alia*, with the purpose of: (i) communicating with one another to effectuate the dissemination of false and misleading information necessary to perpetuate the scheme to defraud Edgewood and others;

41

(ii) avoiding the significant expense of properly and lawfully handling, testing, and/or disposing of the  contaminated concrete; (iii) disseminating false and misleading information concerning the handling, testing, and/or distribution of the contaminated concrete; and (iv) coordinating their concealment of the actual handling, testing, and/or distribution of the contaminated concrete and their knowledge of same.

227.    Examples of such use of the United States mail and wires includes, but is not limited to, the following:

(1)    On August 10, 2004, John Messinger of Arcadis sent an email to Andrew Lewis of Golder, Eric Pearson of Ford, Mike Powell at Ford, and William Robb of Alberici, in which he acknowledged that NJDEP approval would be necessary before using contaminated concrete at the Edison Plant.

(2)    On September 14, 2004, William Robb of Alberici sent via United States mail to Andrew Dillman of the NJDEP a request for variance to use clean crushed concrete as backfill, referenced in paragraph 23 above, in which it represented that "concrete that is not crushed and used as backfill will be segregated for off-site disposal."

(3)    On November 22, 2004, William Robb of Alberici faxed a proposed sales agreement for the distribution of concrete to Grasselli Point Industries.

(4)    On December 6, 2004, a meeting was held by representatives of Ford and Alberici during which the concrete was discussed.  Mike Powell at Ford and Perry Esslinger of Alberici attended the meeting by phone.  At the meeting the parties discussed that the concrete could not be transferred off-site for reuse without a Class B recycling permit.

(5)      On December 7, 2004, William Robb of Alberici sent an email to Perry Esslinger of Alberici acknowledging that concrete containing detections of PCBs could not be transferred off-site, except to go to a landfill.

(6)      On January 12, 2005, William Robb of MA mailed and/or faxed a letter to Eric Pearson of Ford, in which Robb stated that concrete containing detections of PCBs needed to be disposed of in a landfill or other appropriate disposal facility.

(7)      On January 18, 2005, Roy Gunther of Ford faxed the contract entered into between Northeast Developers, Inc. and Ford (described above) to Perry Esslinger of Alberici.

(8)      Upon information and belief, Ford, Alberici, EQ, J&L, Golder and/or Arcadis prepared and/or distributed using the mails and/or wires of the United States a January 27, 2005 memorandum from Golder among themselves and/or to potential recipients of adulterated concrete, falsely stating that only those "stockpiles [of concrete] where the samples exhibited PCB concentrations below the unrestricted use cleanup criteria are currently being staged for potential re-use at appropriate off-site locations," while "stockpiles where the samples exhibited PCB concentrations above the unrestricted use criteria . . . are segregated and properly disposed off-site."

(9)      On April 15, 2005, Eric Pearson of Ford, mailed and/or faxed a letter to Paul Lemley of Alberici, in which Pearson acknowledged: (1) that Ford and Alberici were distributing concrete containing contaminants to third parties for reuse; (2) that the crushing and reuse of the concrete offsite required a permit, which Ford and Alberici had not applied for; and (3) that "Ford has worked with [Alberici] to identify . . . potential users" of the concrete. Thomas Cote, Jay Gardner and Tim Sutton of Ford, as well as other Alberici employees, were copied on the letter.

43

(10)   On April 25, 2005, Chris Hemingway of Golder faxed to Ken Hart of ELM, Inc., Edgewood's environmental consultant, an April 27, 2005 memorandum falsely stating that only those "stockpiles [of concrete] where the samples exhibited PCB concentrations below the unrestricted use cleanup criteria are currently being staged for potential re-use at appropriate off-site locations," while "stockpiles where the samples exhibited PCB concentrations above the unrestricted use criteria . . . are segregated and properly disposed off-site."

(11)   On April 30, 2005, Mike Powell, Ford's project manager, sent Frank Sellinger of Edgewood, a fax designating piles of concrete selected by Ford and its contractors for distribution to Edgewood.

(12)   In May 2005, David Ciroli of EQ faxed and emailed drafts of the Second Contract to John Verlaque of Edgewood.

(13)   Upon information and belief, on or about May 19, 2005, Dave Ciroli of EQ sent to Tim Sutton of Ford via United States mail a pricing estimate relating to the work to be performed by EQ under the Second Contract.

(14)   On June 1, 2005, John Verlaque of Edgewood sent the signed Second Contract via U.S. Mail to David Ciroli of EQ, with a request that copies signed by Ford and EQ be sent to Edgewood.

(15)   On August 5, 2005, David Ciroli of EQ faxed to Chip Caruso of Caruso Excavating Co., Inc. a signed agreement to allow Caruso to obtain concrete containing contaminants from the Edison Plant.

228.   In addition to the foregoing communications, Ford, Alberici, EQ, J&L, Golder, and Arcadis regularly used the mails and wires to communicate between the Edison Plant and these parties' respective out-of-state corporate headquarters and principal places of business.

229.    The conduct, acts, and omissions of Ford, EQ, Alberici, J&L, Golder and Arcadis were an integral part of the overall pattern and practices described herein, including using the mails and wires of the United States in interstate commerce to profit from their scheme to defraud and to avoid the significant expenses of properly and lawfully handling, testing, and/or disposing of the contaminated concrete.

230.    Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of N.J.S.A. 2C:41-1(a)(2), by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343.  While Edgewood does not have full knowledge of the extent of the use of the wires and mails by the enterprise in furtherance of the scheme, the conduct described above identifies some but not all of these violations.

**F.    The Pattern of Racketeering Activity Proximately Resulted in Harm to Edgewood**

231.    Ford, Alberici, EQ, J&L, Golder and/or Arcadis have engaged in, or had their activities affect, commerce.

232.     Ford, Alberici, EQ, J&L, Golder, and/or Arcadis participated, both directly and indirectly, in the conduct of the Enterprise's affairs, as described above, through a pattern of racketeering activity.

233.    By their acts and omissions in operating as an Enterprise to perpetrate the pattern of racketeering activity described herein, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis conspired to defraud, and in fact did defraud, Edgewood and others, and conspired to commit the predicate offenses described herein, in violation of N.J.S.A. 2C:41-2(d).

234.    In engaging in the pattern of racketeering activity described herein, Ford, Alberici, EQ, J&L, Golder, and/or Arcadis intended to, and did, defraud Edgewood.

235.    As a direct and proximate result of Ford, Alberici, EQ, J&L, Golder and/or Arcadis's racketeering activity, Edgewood has suffered damages in an amount to be determined at trial.

236.    Under N.J.S.A. 2C:41-4(c), Edgewood seeks recovery of treble damages, the costs of bringing this lawsuit, and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands judgment against Defendants J&L, Golder and Arcadis:

(a)    Awarding Edgewood compensatory, consequential, and incidental damages; including without limitation diminished value of the Properties and damage for stigma;

(b)    Awarding Edgewood treble damages for J&L, Golder and/or Arcadis's violation of the New Jersey RICO Statute;

(c)    Awarding Edgewood punitive damages for J&L, Golder and/or Arcadis's fraudulent, willful, and wanton misconduct;

(d)    Entering a declaratory judgment pursuant to the Spill Act against J&L, Golder and Arcadis, and in favor of Edgewood declaring that J&L, Golder and Arcadis are liable for response costs and damages at the Properties;

(e)    Entering a declaratory judgment pursuant to CERCLA against J&L, Golder and Arcadis, and in favor of Edgewood declaring that J&L, Golder and Arcadis are liable for response costs and damages at the Properties;

(f)    Awarding Edgewood interest, costs of suit, attorneys' fees, and expert fees; and

(g)     Awarding Edgewood any other such relief as the Court deems just and

proper.

Dated: February 8, 2008

/s   David W. Fassett
ARSENEAULT, WHIPPLE, FARMER, FASSETT
& AZZARELLO, LLP
Jack Arseneault (JA 6292)
David W. Fassett (DWF 1636)
560 Main Street
Chatham, NJ 07928-2119
(973) 635-3366

MILBERG WEISS LLP
Melvyn I. Weiss (admitted *pro hac vice*)
Ariana J. Tadler
Jennifer L. Young (admitted *pro hac vice*)
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

STEPTOE & JOHNSON LLP
Steven K. Davidson
        (*pro hac vice* application pending)
Seth Goldberg
        (*pro hac vice* application pending)
Brooke L. Gaede
        (*pro hac vice* application pending)
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3000

Attorneys for Edgewood Properties, Inc.