**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

EDGEWOOD PROPERTIES, INC.                )
                                         )        Hon. Harold A. Ackerman
                         Plaintiff,      )
                                         )        Civil Action No. 08-774
            v.                           )
                                         )        **OPINION & ORDER**
J&L MANAGEMENT CORPORATION,              )
GOLDER ASSOCIATES, INC., and             )
ARCADIS U.S., INC.,                      )
                                         )
                         Defendants.     )
_____)

Jack Arseneault, Esq.
David Fassett, Esq.
ARSENEAULT, WHIPPLE, FARMER, FASSETT & AZZARELO, LLP
560 Main Street
Chatham, NJ 07928

Ronald P. Heksch, Esq.
GIORDANO HALLERAN & CIESLA, P.C.
125 Half Mile Rd. Ste. 300
Red Bank, NJ 07701

Ariana J. Tadler, Esq.
Jennifer L. Young, Esq.
MILBERG WEISS, LLP
One Pennsylvania Plaza
New York, NY 10119

Steven K. Davidson, Esq.
Seth Goldberg, Esq.
Brooke L. Gaede, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
_Attorneys for Edgewood Properties, Inc._

Christopher J. McKenzie, Esq.
Michael G. Murphy, Esq.
BEVERIDGE & DIAMOND
50 East Palisade Avenue, Suite 209
Englewood, NJ 07631
*Attorneys for Defendant Arcadis, U.S., Inc.*

**ACKERMAN, Senior District Judge:**

This action arises from the demolition of a car manufacturing facility and the subsequent

attempt to reuse crushed concrete from that facility at other properties in New Jersey, where

some of the crushed concrete contained a quantity of a contaminant in excess of statutory

environmental limits.  Before the Court is Defendant Arcadis U.S., Inc. ("Arcadis") motion to

dismiss (Doc. No. 8) Edgewood Properties, Inc.'s ("Edgewood") claims against it.  Separately,

this Court dismissed with prejudice Edgewood's claims against Defendant J&L Management,

Inc. on November 17, 2008.  For the following reasons, Arcadis's motion to dismiss will be

granted in part and denied in part.

## BACKGROUND

This Opinion is the third occasion upon which this Court has ruled on this dispute.  The

first two rulings, now consolidated under Civil No. 06-1278, involved a suit by Ford Motor

Company ("Ford") against Edgewood, which eventually grew to include at least seven parties.

*See Ford Motor Co. v. Edgewood Prop., Inc.*, No. 06-1278, 2008 WL 4559770 (D.N.J. Oct. 8,

2008) ("*Edgewood III*"); *Ford Motor Co. v. Edgewood Prop., Inc.*, Nos. 06-1278, -4266, 2007

WL 4526594 (D.N.J. Dec. 18, 2007) ("*Edgewood II*").  Prior to consolidation before this Court, a

related suit stemming from the same nucleus of facts was adjudicated by another court in this

District.  *See Preferred Real Estate Inv., Inc. v. Edgewood Prop., Inc.*, No. 06-4266, 2007 WL 81881 (D.N.J. Jan. 9, 2007) ("*Edgewood I*").  The Court is familiar with this dispute and will summarize those facts relevant only to the specific case at hand.

Ford operated an automobile assembly plant located on U.S. Route 1 in Edison Township, New Jersey (the "Ford site" or "Plant").  In February 2004, Ford closed the Plant and began dismantling and decommissioning the structure.  As required by the Industrial Site Recovery Act ("ISRA"), *see* N.J. Stat. Ann. § 13:1K-6, Ford entered into a Remediation Agreement with the New Jersey Department of Environmental Protection ("NJDEP") to facilitate the lawful demolition of the building.

In February 2004, Ford contracted with MIG/Alberici LLC ("Alberici") to conduct the demolition of the Plant's concrete floor slabs, which Alberici planned to reuse for on-site fill and road bed.  In turn, Ford and Alberici hired multiple subcontractors, including EQ Northeast, Inc. ("EQ"), to assist in decommissioning the site.  Important for this suit, Ford also hired Golder and Arcadis[1] to serve as consultants responsible for environmental issues related to decommissioning the structure.

Ford's contract with Alberici required Alberici to dispose of the concrete from the demolition project by following NJDEP regulations governing chemical detections of polychlorinated biphenyls ("PCBs") in the concrete material.  By way of background, NJDEP regulations allow distribution of concrete material with a PCB detection level below 0.49 parts per million ("ppm") for use in residential zones, and distribution of concrete material with a

_____

[1] Arcadis is a Delaware Corporation with its principal place of business in Denver, Colorado.

detection level between 0.49 ppm and 2 ppm for use in commercial zones.  Concrete material that tests for PCB concentration above 2 ppm is prohibited by the NJDEP for reuse anywhere whatsoever.

On September 14, 2004, Ford and Alberici, with input from Arcadis and Golder Associates, Inc. ("Golder"), requested permission from NJDEP to re-use concrete at the Ford site, provided that the crushed material did not contain unlawful detections of PCBs.  On November 9, 2004, NJDEP approved the request.

Edgewood contends that, in November 2004, Ford, Alberici, Golder, and Arcadis "received analytical results with positive PCB detections in many of the core samples taken from concrete pad areas located inside" the Plant.  (Compl. ¶ 31.)  Accordingly, those four parties "agreed on a plan to handle and test the concrete for PCB contamination, which included stockpiling large volumes of concrete, crushing the concrete, placing the crushed concrete into smaller piles, and collecting a sample from each pile."  (*Id.* ¶ 35.)  Edgewood alleges that, by intention, recklessness, or negligence, those four parties "failed to detect PCB contamination levels in the concrete," which they agreed to distribute to outside parties for re-use offsite. (Compl. ¶ 36.)

One such outside party was Edgewood.[2]  On February 24, 2005, Ford and Edgewood entered into a written agreement (the "First Contract").  Ford agreed to provide Edgewood with up to 50,000 cubic yards of crushed concrete from the Plant "containing constituents below NJDEP unrestrictive use criteria," and in return Edgewood agreed to transport the material off-

---

[2] Edgewood is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey.

4

site for use as fill.  (Compl. ¶ 49.)  Edgewood alleges that Ford represented that the terms of their

agreement meant that Edgewood would receive concrete with PCB levels suitable for residential

use, i.e., "unrestrictive use."  Pursuant to the First Contract, Edgewood received approximately

32,000 cubic yards of crushed concrete material from the Plant and subsequently transported the

material to at least seven New Jersey properties (the "Properties").[3]  Allegedly, the First Contract

was just one of many "zero dollar sales agreements" promulgated by Ford: Third parties received

concrete at no cost, and Ford enjoyed the benefit of avoiding millions of dollars in transportation

and disposal costs.  (*Id.* ¶ 41.)

Edgewood contends that the roles of Golder and Arcadis in this transaction were narrow,

but essential: Golder and Arcadis were "responsible for determining a sampling methodology for

the concrete, testing the concrete, interpreting the test results, and/or designating which piles of

concrete would be loaded onto Edgewood's trucks."  (*Id.* ¶ 52.)  According to Edgewood,

"Arcadis knew that Edgewood intended to use the concrete as fill on its property development

sites," yet "provided Edgewood with concrete exceeding" residential zone criteria.  (*Id.* ¶¶ 53,

57.)

On April 27, 2005, Golder forwarded to Edgewood a memorandum stating that only

crushed concrete with unrestrictive detections of PCBs was being distributed to Edgewood, while

concrete with PCB concentrations above the unrestricted use criteria was being segregated and

disposed offsite.  Edgewood alleges that Acradis, among other Ford-employed parties, aided and

---

[3] Edgewood transported concrete from the Ford site to the following seven New Jersey properties: American Standard, Hamilton Township; Fulton Street, New Brunswick; Applegarth, Monroe Township; Laurelton Mobile Home Park, Brick Township; West Windsor Township Site, West Windsor; and Tingley Rubber, South Plainfield.  (Compl. ¶ 84.)

"caused" Golder to "misrepresent" the nature of the distribution.  (*Id.* ¶¶ 63-66.)

On June 10, 2005, Edgewood entered into a Subcontract (the "Second Contract") with EQ to test crushed concrete from the Plant.  According to the Second Contract, Edgewood would crush concrete at the Ford site after which EQ would test the material for environmental contamination.  Edgewood contends that Ford, Alberici, Golder and/or Arcadis "assisted and/or supervised EQ in the sampling, testing, stockpiling, labeling, and selection of concrete for distribution."  (*Id.* ¶ 77.)

On June 23, 2005, Edgewood alleges it discovered that the concrete it received exceeded residential, and in some instances, commercial, use criteria.  In September 2005, Ford responded to Edgewood's complaints by commencing excavation, removal, and disposal of concrete that Edgewood had transported to the Properties.  According to Edgewood, the distribution of contaminated concrete resulted from the malfeasance of Ford and its agents, including Arcadis and Golder.  According to Ford, as alleged in its First Amended Complaint in Civil Action No. 06-1278, contaminated concrete found on the Properties resulted from Edgewood's commingling of Ford concrete with contaminated concrete acquired from non-Ford suppliers.

On March 8, 2006, NJDEP issued an Order, *In the Matter of Ford Motor Company/Ford Motor Land Development Corporation, Edgewood Properties Inc. and MIG/Alberici, L.L.C., Respondents*, EA ID# PI V1166 (the "Administrative Order"), pursuant to the New Jersey Spill Compensation & Control Act ("Spill Act"), the Solid Waste Management Act, and the Solid Waste Utility Control Act.  The Administrative Order declared that "concrete materials contaminated with PCBs of various ranges have been located at the Properties, as well as at other non-Edgewood sites."  *Edgewood III*, 2008 WL 4559770 , at *2 (internal citations omitted).  The

6

Administrative Order directed Ford, Edgewood and Alberici to submit a Response Plan to NJDEP "to complete the removal of all contaminated concrete waste material transported from Ford Motor Company's Plant Site in Edison New Jersey and brought to the [Seven Properties]." *Id.* Pursuant to the Administrative Order, Ford conducted investigations, remediation work, and other response actions at the Properties identified by NJDEP.

On February 2, 2008, Edgewood filed a Complaint in this Court against Arcadis for recovery of costs and declaratory relief under the Spill Act, N.J. Stat. Ann. § 58:10-23.11(f)(a)(2)(a); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(4)(B); as well as common law strict liability, negligence, civil conspiracy, and the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J. Stat. Ann. § 2C:41-1.

Arcadis moves to dismiss all claims against it. Except where federal law governs a claim, this Court exercises supplemental jurisdiction and applies the law of the state of New Jersey to test the sufficiency of Edgewood's claims.

## ANALYSIS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint or parts of a complaint before or after filing an answer. A motion to dismiss will be granted if a count or complaint fails to state a claim upon which relief can be granted. In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir.

7

2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)); *see also Labov v. Lalley*, 809 F.2d 220, 221 (3d Cir. 1987).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007) (internal citations omitted).  Yet, "[u]nder the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim."  *Foundation Credit Funds, LLC v. Branch Banking & Trust Co.*, No. 06-0893, 2006 WL 3780677, at *1 (D.N.J. Dec. 21, 2006).  A court need not accept "'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness," *Wyeth v. Ranbaxy Labs., Ltd.*, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Kanter*, 489 F.3d at 177 ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.") (quoting *Evancho*, 423 F.3d at 351).

## I.    Edgewood States a Claim for Cost Recovery Under CERCLA.

In Count II, Edgewood pursues a CERCLA cost recovery claim against Arcadis. Pursuant to 42 U.S.C. § 9607(a), "any person who by contract, agreement, or otherwise *arranged* for disposal or treatment of hazardous substances at any facility" is liable for recovery costs under CERCLA.  (Emphasis added).  For purposes of § 9607(a), a "person" may include, *inter*

*alia*, an individual, corporation, association, or partnership.  42 U.S.C. § 9601(21).  Edgewood

pursues a CERCLA claim against Arcadis for its alleged role as an "arranger."

Our Circuit has set forth a two-pronged test to determine arranger liability.  *See Morton*

*Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 678 (3d Cir. 2003).  First, a plaintiff must plead

"ownership or possession of a material by the defendant."  *Id.* at 679.  Second, a plaintiff must

allege "the defendant's knowledge that the processing of that material can or will result in the

release of hazardous waste," or that the defendant controlled the production process.  *Id.*

Examining the first prong, it is undisputed that Arcadis did not own the concrete material.

The question is whether Edgewood has sufficiently alleged that Arcadis *possessed* the material.

To allege arranger liability under CERLCA, the plaintiff's "burden can be established through a

showing of constructive possession."  *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, No. 02-

3830, 2006 WL 3366167, at *3 (E.D. Pa. Nov. 20, 2006).  "[C]onstructive possession exists if an

individual knowingly has both the power and intention at a given time to exercise dominion or

control over a thing, either directly or through another person or persons."  *United States v.*

*Cartwright*, 359 F. 3d 281, 290 (3d Cir. 2004) (internal citations omitted).  Here, it is arguable

whether Edgewood need even rely on constructive possession to satisfy its burden.  Edgewood

alleges that Arcadis was responsible for "testing the concrete, interpreting the test results, and/or

designating which piles of concrete would be loaded onto Edgewood's trucks."  (Compl. ¶ 52.)

Viewing these allegations in a light most favorable to Edgewood, Edgewood sufficiently alleges

that Arcadis possessed the concrete by virtue of its testing and handling duties.

Second, Edgewood alleges that Arcadis knew the material was hazardous and knew that

Edgewood intended to use the concrete as fill on the Properties.  (*Id.* ¶¶ 36, 55-57, 64.)

9

Edgewood satisfies both prongs under Third Circuit precedent, and thus, states a claim for cost recovery under CERCLA.

Arcadis argues that documents relied upon by Edgewood in its Complaint, namely the First and Second Contracts, conclusively demonstrate that Arcadis did not possess the concrete.[4] Specifically, Arcadis asserts that "neither contract makes any reference" to it, "let alone contains information to support an allegation of ownership or possession." (Arcadis Br. at 14.) As a preliminary matter, at this early pleading stage, Edgewood need not provide any evidentiary "support" whatsoever for its allegations. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424-25 ("[S]ince the district court was ruling on a motion to dismiss, it was not permitted to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based."); *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 636 (S.D. Tex. 2007) ("The court is not concerned at this stage whether Celanese will be able to prove facts to support arranger liability[.]").

Moreover, the absence of Arcadis from these contracts does nothing to contradict Edgewood's allegations that Arcadis was hired independently by Ford to test the concrete; that Arcadis did handle and test the material; and that Arcadis helped prepare the concrete for transportation offsite. That Arcadis was not a party to the First and Second Contracts means only that Arcadis was not a party to the First and Second Contracts. Even then, Edgewood alleges that

---

[4] A court may only adjudge a motion to dismiss on the face of the non-moving party's pleadings. *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985). However, a "'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Arcadis "assisted and/or supervised EQ in the sampling, testing, stockpiling, labeling, and selection of concrete for distribution" under the Second Contract.  (Compl. ¶ 77.)  Arcadis's motion to dismiss Edgewood's CERCLA claim will be denied.


## II.    Edgewood States a Claim Under the New Jersey Spill Act.

To state a claim under the New Jersey Spill Act, N.J. Stat. Ann. § 58:10-23.11, a plaintiff must allege that the defendant was "in any way responsible for" the discharge of a hazardous substance, and that the plaintiff engaged in clean-up or removal of the hazardous substance. *Edgewood I*, 2007 WL 81881, at *2 (denying motion to dismiss Spill Act claim); *see also Kemp Indus. v. Safety Light Corp.*, No. 92-95, 1994 WL 532130, at *32 (D.N.J. Jan. 25, 1994) (expressing that "a cause of action under section 23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance") (citing *Hatco Corp. v. W.R. Grace & Co.-Conn.*, 836 F. Supp. 1049, 1093 (D.N.J. 1993) ("To qualify as a contribution plaintiff [under the Spill Act], [a plaintiff] must demonstrate that it has cleaned up and removed a discharge of a hazardous substance.")).  Discharge is defined as "any intentional action or commission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, or dumping of hazardous substances into the waters, or onto the lands of the State." N.J. Stat. Ann. § 58:10-23.11(b).  The standards for liability are the same under the Spill Act as under CERCLA.  *Fishbein Family P'ship v. PPG Indus., Inc.*, 871 F. Supp. 764, 772 (D.N.J. 1994).

As discussed earlier with regard to CERCLA, Edgewood has sufficiently alleged that Arcadis is responsible in some way for the discharge of a hazardous substance through its

11

"arranger" activities.  Edgewood alleges that Arcadis is responsible for the discharge of the contaminants due to Arcadis's failures to properly test the material, notify the authorities of the contamination, and properly stockpile, categorize, and dispose of the concrete.  (Compl. ¶¶ 103, 107.)  As a result of this contamination, Edgewood has engaged in clean-up efforts.  (*Id.* ¶ 86.)

Arcadis presents no arguments regarding the Spill Act unrelated to the CERCLA arguments this Court has already rejected.  For the reasons discussed above, the Court finds that Edgewood states a claim under the New Jersey Spill Act.  Arcadis's motion to dismiss Count I will be denied.

III.   **Edgewood Fails to State a Claim for Common Law Strict Liability.**

In Count III, Edgewood pursues a claim for common law strict liability based on Arcadis's conduct of "abnormally dangerous activity."  *See Biniek v. Exxon Mobil Corp.*, 358 N.J. Super. 587, 598 (2002) (espousing strict liability for "abnormally dangerous activity").  "This doctrine imposes liability on those who, despite social utility, introduce an extraordinary risk of harm into the community for their own benefit."  *Id.* (citing *T & E Indus. v. Safety Light Corp.*, 123 N.J. 371, 386-87 (1991)).  To determine the doctrine's applicability, New Jersey courts have adopted the principles set forth in the Restatement of Torts.  *Biniek*, 358 N.J. Super. at 598.  "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."  Restatement (Second) of Torts § 519.  Whether an activity is abnormally dangerous is to be determined on a case by case basis.  *State Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 491 (1983) (concluding that "mercury and other toxic wastes are

'abnormally dangerous' and that disposal of them, past or present, is an abnormally dangerous activity").  In considering the question of whether an activity is abnormally dangerous, a court is guided by the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520; *Biniek*, 358 N.J. Super. at 598-99.

Here, Edgewood's allegations fall short of establishing "abnormally dangerous" conduct. While some of the Restatement factors may favor a finding of "abnormally dangerous" at this stage, such as the existence of a high degree of risk, other factors decisively cut the other way. Most significantly, accepting Edgewood's allegations as true, Arcadis had the ability to eliminate the risk in its testing and segregation duties by exercising reasonable care.  In fact, Edgewood's chief allegation is that Arcadis acted intentionally, recklessly, or negligently in performing its testing duties.  (Compl. ¶ 36.)  It thus follows that, if Arcadis exercised reasonable care, it could have prevented the contamination of the Properties.  *See Montville Twp. v. Woodmont Builders, LLC*, No. 03-2680, 2004 U.S. Dist. LEXIS 30606, at *29 (D.N.J. Sept. 10, 2004) ("[A]ny harm from failure to identify areas of concern . . . resulting from the performance of a Phase I Environmental Assessment . . . can be eliminated by the exercise of reasonable care."), *rev'd on other grounds*, 244 F. App'x 514 (3d Cir. 2007); *T & E Indus., Inc.*, 227 N.J. Super. at 240 (App. Div. 1988) ("Strict liability . . . refers to liability that is imposed apart from any recovery on a

theory that defendant knowingly or purposely interfered with a legally protected interest or was negligent[.]") (internal citation and quotation marks omitted).  Edgewood also fails to substantively allege that the Ford site was inappropriate for the performance of Arcadis's activities.  Indeed, Edgewood alleges that NJDEP expressly approved the testing and segregation of the concrete at the site.  (*Id.* ¶ 25.)

Edgewood fails to present any case law supporting the finding that the performance of such activities, even if improperly conducted, is an abnormally dangerous activity.  Furthermore, a balance of the Restatement factors indicates that Arcadis's testing activities simply do not rise to "abnormally dangerous."  Therefore, Count III of Edgewood's Complaint will be dismissed.

## IV.    Edgewood States a Claim for Negligence.

In Count V, Edgewood alleges negligence against Arcadis.  The "traditional negligence elements [are] duty, foreseeability, breach, and causation."  *Consolidated Rail Corp v. Gottshall*, 512 U.S. 532, 566 (1994).   "The imposition of a duty to exercise care to avoid a risk of harm to another involves considerations of fairness and public policy implicating many factors."  *Olivio v. Owens-Illinois, Inc.*, 186 N.J. 394, 401 (2006).  "The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care."  *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 572 (1996).  Factors to consider are "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."  *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993).  Stated differently, "the concept of foreseeability [subsumes] many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the

14

tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." *Carter Lincoln- Mercury, Inc. v. EMAR Group, Inc.*, 135 N.J. 182, 194 (1994).

Edgewood alleges that Arcadis decommissioned the Ford Plant "with knowledge that Ford and its agents would be transferring recycled concrete to third parties like Edgewood," and that "Arcadis owed Edgewood a duty of care to comply with all federal, state, and local laws relating to the transfer of recycled concrete and to otherwise manage [such duties] in a reasonable and safe manner." (Compl. ¶ 140.) Arcadis objects that it owed no duty of care to Edgewood because (a) it was not "present at any of the meetings that included or even discussed Edgewood"; (b) it did not make any representations to, nor have any contact with, Edgewood itself; and (c) it "was not a party to any of the relevant contracts and was not in privity" with Edgewood. (Arcadis Br. at 29.)

As a preliminary matter, "[p]rivity is . . . irrelevant to an action based on negligence." *Impex Agric. Commodities Div. v. Leonard Parness Trucking Corp.*, 576 F. Supp. 587, 590 (D.N.J. 1983). Moreover, Arcadis's argument bears resemblance to the unsuccessful argument advanced by Alberici — also an independent contractor hired by Ford — in *Edgewood II*. In *Edgewood II*, Alberici argued: "[N]othing in New Jersey case law . . . approaches attaching a legal duty of care in the case in which a company, which is not a landowner, is conducting operations at a site and the actual owner of the site and other third-parties enter into contractual arrangements for disposal of material away from the site, where the aforementioned company is not even a party to those contractual arrangements." *Edgewood II*, 2007 WL 4526594, at *7 (quoting Alberici's Br. at 10). Examining the above-listed factors and caselaw, this Court explained that "Alberici's characterization of New Jersey law is unfounded," *id.* at *7, and held

15

that Alberici owed Edgewood a legal duty of care, *id.* at *8.  The Court finds the same here.

In *Sun Pipeline Co. v. Conti Construction Co.*, another court in this District found that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking."  No. 86-2011, 1989 U.S. Dist. LEXIS 6213, at *7-8 (D.N.J. June 1, 1989) (citation omitted).  The court then enumerated three scenarios that would give rise to imposing a legal duty of care on an independent contractor: if "[1] his failure to exercise reasonable care increases the risk of such harm; or [2] he has undertaken to perform a duty owed by the other to the third person, or [3] the harm is suffered because of reliance of the other or the third person upon the undertaking."  *Id.* at *8; s*ee also Diaz v. Johnson Matheny*, 869 F. Supp. 1155, 1167 (D.N.J. 1994) ("The New Jersey Supreme Court has held that a third party injured as a result of the negligent performance of an act by an independent contractor has a cause of action in tort even though that third party could not base his action in contract since he was not a party to the contract."); *Bacak v. Hoya*, 4 N.J. 417, 422 (1950) ("Thus it has been uniformly held that an independent contractor is liable to a third person injured as a result of the negligence of the independent contractor or his servants in the performance of his work for the contractee in an action based in tort, although such third person could not base his action upon the contract to which he was not a party.").

Here, like in *Edgewood II*, the Court infers that Edgewood alleges one or all of the scenarios outlined in *Sun Pipeline*: that, by failing to properly test and handle the concrete, Arcadis "increas[ed] the risk of [] harm" to Edgewood; that Arcadis undertook a duty owed by

16

Ford to Edgewood; or that Edgewood suffered harm because it relied on Arcadis's undertaking. *See Sun Pipeline*, 1989 U.S. Dist. LEXIS 6213, at *8.

Further, looking at the other foreseeability factors,[5] the relationship between Edgewood and Arcadis, though not contractual, was established through Ford, which was in contract with Edgewood.  Pursuant to the First Contract with Ford, "Edgewood sent trucks to the Ford Plant to pick up the concrete," yet "Arcadis . . .  failed to request the proper permits to transfer the concrete to Edgewood, . . . and select[ed] concrete for Edgewood to remove from the [Ford] site that exceeded the [residential] and/or [commercial use] criteria."  (Compl. ¶¶ 56, 141.) Edgewood alleges that the nature of the risk was understood, too, because "Arcadis intentionally, recklessly, and/or negligently developed a plan to handle and test concrete for [] contamination that failed to detect [] contamination levels in the concrete they intended to distribute for possible re-use offsite."  (*Id.* ¶ 36; *see also id.* ¶ 38 ("Arcadis agreed to distribute to others, for re-use offsite, concrete that tested positive for [] contamination without obtaining necessary permits, approvals, or exemptions for such distribution.").)  Finally, Edgewood discusses at length the ability and opportunity of Arcadis to exercise care, but "Arcadis provided Edgewood with concrete exceeding [residential use] criteria."  (*Id.* ¶ 57; *see also id.* ¶¶ 35-38, 52, 55-56, 140-41.)

Edgewood sufficiently alleges that Arcadis owed Edgewood a legal duty of care.  There is no dispute concerning Edgewood's allegations as to the remaining elements of negligence, and this Court finds that Edgewood sufficiently alleges such elements.  (*See* Compl. ¶¶ 140-42.) Accordingly, Count V states a claim upon which relief can be granted, and Arcadis's motion to

---

[5] These factors include "the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care."  *Carter Lincoln-Mercury*, 135 N.J. at 194.

dismiss Count V will be denied.

## V.      Edgewood States a Claim Under NJ RICO.

In Count VII, Edgewood pursues a claim under the New Jersey Racketeer Influenced and

Corrupt Organizations Act ("NJ RICO"), N.J. Stat. Ann. § 2C:41-1.  NJ RICO confers a private

right of action on "[a]ny person damaged in his business or property by reason of a violation of"

NJ RICO.  N.J. Stat. Ann. § 2C:41-4c.  Under NJ RICO, "[i]t shall be unlawful for any person

employed by or associated with any enterprise engaged in or activities of which affect trade or

commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's

affairs through a pattern of racketeering activity[.]"  N.J. Stat. Ann. § 2C:41-2(c).  Thus, to state

a claim under NJ RICO, a plaintiff must allege "(1) the existence of an enterprise affecting trade

or commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that

the defendant participated, either directly or indirectly, in the conduct or the affairs of the

enterprise; and (4) that defendant participated through a pattern of racketeering activity that must

include the allegation of at least two predicate acts."  *Horowitz v. Marlton Oncology, P.C.*, 116

F. Supp. 2d 551, 554 (D.N.J. 1999).

"The 'enterprise' element will be satisfied if there exists a group of people, no matter how

loosely associated, whose existence or association provides or implements the common purpose

of committing two or more predicate acts."  *State v. Ball*, 268 N.J. Super. 72, 143 (App. Div.

1993).  "Racketeering" is defined in the state statute as any one of a number of predicate

offenses, including various "fraudulent practices," N.J. Stat. Ann. § 2C:41-1(1)(o), or unlawful

conduct defined under the federal RICO statute, 18 U.S.C. § 1961(1).

18

Here, Edgewood alleges predicate acts based on violations of four different statutes incorporated under NJ RICO: (1) 18 U.S.C. § 1341 (federal mail fraud); (2) 18 U.S.C. § 1343 (federal wire fraud); (3) N.J. Stat. Ann. § 2C:21-16 (securing execution of documents by deception); and (4) N.J. Stat. Ann. § 2C:21-7 (selling or offering for sale adulterated or mislabeled commodities).  Arcadis challenges both whether Edgewood properly alleges the necessary predicate acts under those statutes, and whether Edgewood sufficiently alleges a "pattern of racketeering activity."  Because finding at least two predicate acts precedes establishing a "pattern of racketeering activity," the Court will first examine whether Edgewood pleads the necessary predicate offenses.  *See Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) ("In order to make out a RICO claim, appellants first must show that the casinos committed the predicate criminal acts enumerated by RICO."); *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 371 (D.N.J. 1999) (assessing predicate racketeering acts before determining that a "pattern" of such activity exists).

In the course of examining Edgewood's allegations of predicate acts, the Court will simultaneously discuss the first three elements of an NJ RICO claim: (1) the existence of an enterprise affecting trade or commerce, and (2) Arcadis's association and (3) participation in the enterprise.  Ultimately, this Court will find that Edgewood alleges the necessary predicate acts and a "pattern of racketeering activity" to satisfy an NJ RICO cause of action.

### A.    *Edgewood Sufficiently Alleges at Least Two Predicate Acts of Racketeering for Mail and Wire Fraud.*

Edgewood alleges that Arcadis engaged in incidents of racketeering activity in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  To state a claim for

mail or wire fraud, a plaintiff must allege: (1) a scheme or artifice to defraud; (2) use of the mails or interstate wires in furtherance of the scheme; and (3) participation by the defendant in the scheme.  *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir. 1994); *see also United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) ("The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute except it speaks of communications transmitted by wire.").

A "scheme to defraud . . . is not defined according to any technical standard," *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978), but is generally evidenced by "the deprivation of something of value by trick, deceit, chicane or overreaching," *McNally v. United States*, 483 U.S. 350, 358 (1987) (internal quotation marks omitted).  "Proof of specific intent is required, which may be found from a material misstatement of fact made with reckless disregard for the truth."  *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995) (citation and internal quotation marks omitted).

"To be part of the execution of [mail] fraud . . . the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot."  *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (citations and quotation marks omitted).  The Third Circuit has noted that even "completely innocent mailings" (those that contain no false information) can satisfy the mailing element.  *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (citation and quotation marks omitted); *see also Tabas v. Tabas*, 47 F.3d 1280, 1295 n.18 (3d Cir. 1995).  The same standard applies for wire fraud.  *See Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 247 (D.N.J. 2000) (recognizing that "even 'innocent' use of the wires can base an actionable wire fraud claim") (quoting *Kehr Packages*, 926 F.2d at 1415; *Schmuck*, 489 U.S. at

710-11).

Each element of wire and mail fraud must be pled with particularity under Fed. R. Civ. P.

9(b). *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

"In order to satisfy Rule 9(b), plaintiffs must plead with particularity the circumstances of the

alleged fraud in order to place the defendants on notice of the precise misconduct with which

they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent

behavior." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).  A plaintiff may satisfy this

requirement by pleading the "date, place or time" of the fraud, or through "alternative means of

injecting precision and some measure of substantiation into their allegations of fraud." *Seville*,

742 F.2d at 791.  A plaintiff also must allege who made a misrepresentation to whom and the

general content of the misrepresentation. *Klein v. Gen. Nutrition Co., Inc.*, 186 F.3d 338, 345

(3d Cir. 1999); *Rolo v. City Inv. Co. Liquidating Trust*, 155 F.3d 644, 658-59 (3d Cir. 1998).

Here, Edgewood asserts that Arcadis participated directly and indirectly in a scheme or

artifice to defraud.  Edgewood alleges that "Ford, EQ, Alberici, J&L, Golder and Arcadis [the

'Enterprise Parties'] formed an enterprise with the intent of distributing concrete that they knew

was contaminated in violation of environmental regulations." (Compl. ¶ 172.)  The Enterprise

Parties "schemed to distribute this concrete (and transmitted their repeated false statements that

perpetrated this scheme through the wires and mails) so as to avoid incurring the costs . . . of

disposing of this material properly[.]" (*Id.*)  This scheme was executed by concealing the true

contamination levels of the concrete to induce Edgewood and other victims into accepting it.

(*Id.*)

Edgewood alleges that each Enterprise Party was assigned its own task "to effectuate

[the] unlawful purpose." (*Id.* ¶ 179.) Arcadis's responsibility in the scheme was to decide "what level of contaminated concrete could/would be used as backfill" at the Plant; "how to sample the concrete for the existence of PCBs"; and "how and when to label and consolidate piles of crushed concrete." (*Id.* ¶ 185.) In furtherance of the scheme, Arcadis "intentionally, knowingly, and/or recklessly proposed deficient sampling and distribution plans which resulted in the unlawful distribution of contaminated concrete to Edgewood and other parties." (*Id.* ¶ 186.)

For instance, on January 13, 2005, an outside party, Northeast Developers, Inc., contracted with Ford to receive crushed concrete with specified levels of contaminants. Similar contracts were entered into with North Creek CCC on January 18, 2005; Edgewood on February 23, 2005 (First Contract); and Caruso Excavating Co. on August 9, 2005. In all these cases, Edgewood alleges, Ford and/or EQ, in furtherance of the scheme to defraud, deceived the outside parties as to the nature and extent of the contamination so as to dispose of the concrete at minimal monetary cost to the Enterprise Parties. (*Id.* ¶ 208.)

Edgewood's allegations as to the first element of mail and wire fraud — an artifice or scheme to defraud — satisfy the heightened pleading requirements of Rule 9(b). Edgewood has alleged with precision and substantiation the existence of an enterprise, the purpose of the scheme, which Enterprise Party did what, to whom, and the general content of the misrepresentations, all aimed at "depriving" Edgewood and others of re-usable concrete. Edgewood has even pled the date, place, or time of many of the alleged occurrences of fraud, as well as the Enterprise Parties' specific intent to defraud Edgewood. Thus, the Court proceeds to the second element of mail and wire fraud — use of the mails or interstate wires in furtherance of the scheme.

As this Court already recognizes, any use of the mails and/or wires will satisfy a violation of the statutes, so long as it is "incident to an essential part of the scheme." *Schmuck*, 489 U.S. at 715.  Edgewood alleges that, on at least fifteen different occasions, the Enterprise Parties employed the mails and interstate wires to effectuate their scheme.  For example, Edgewood alleges that on January 27, 2005, Arcadis and/or other Enterprise Parties[6] distributed a memorandum over the mail and/or wires, initially among the Enterprise Parties alone, stating that only concrete that exhibited PCB concentrations below the unrestricted use criteria were currently being staged for re-use offsite.  (*Id.* ¶ 227(8).)  Edgewood alleges that this memorandum was ultimately sent by Golder to an Edgewood representative on April 25, 2005 to assure Edgewood that the concrete it was receiving from the Ford site contained levels of contamination suitable for "unrestrictive use."  This mailing and/or wire communication furthered the fraudulent scheme because, accepting Edgewood's allegations as true, it contained a deliberately misleading statement as to the extent of the contamination, and was sent to fraudulently assure Edgewood that it would receive concrete in compliance with the First Contract when in fact Edgewood was receiving concrete unsuitable for unrestrictive use.

In several other examples of the use of the mails or interstate wires, Arcadis played little or no obvious role in the drafting or distribution of the communications.  However, whether Arcadis was allegedly involved in the actual mailing or wiring act in every instance is immaterial

---

[6] Edgewood's "and/or" allegations suffice at this pleading stage because to "identify the specific wrongful acts attributable to particular defendants would place an insurmountable goal and burden to the maintenance of such actions" under Rule 9(b).  *In re Midlantic S'holder Litig.*, 758 F. Supp. 226, 233 (D.N.J. 1990); *see also Petro-Tech, Inc. v. W. Co. of N. Am.*, 824 F.2d 1349, 1362 (3d Cir. 1987) ("[A]t this stage of the case plaintiffs need not attribute each individual act to the individual defendant who committed it.").

because "the defendant need not personally send the mailing or even intend that it be sent."
*United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002) (Alito, J.); N.J. Stat. Ann. § 2C:41-2(c)
("It shall be unlawful for any person . . . associated with any enterprise engaged in or activities of
which affect trade or commerce to conduct or participate, directly *or indirectly, in the conduct of
the enterprise's affairs* through a pattern of racketeering activity[.]") (emphasis added).  A
defendant "'causes' the mails to be used where the defendant 'does an act with knowledge that
the use of the mails will follow in the ordinary course of business, or where such use can
reasonably be foreseen, even though not actually intended[.]'"  *Id.* (quoting *Pereira v. United
States*, 347 U.S. 1, 8-9 (1954)).

　　　　One alleged example of a use of the wires where Arcadis was not expressly involved was
a January 18, 2005 fax from Roy Gunther of Ford to Perry Esslinger of Alberici disclosing a copy
of the contract entered into between Northeast Developers, Inc. and Ford.  In light of
Edgewood's allegation that Arcadis agreed to the Enterprise objective in December 2004 "to
distribute to others, for re-use offsite, concrete that tested positive for PCB contamination"
(Compl. ¶ 38), and Arcadis's subsequent testing and segregation activities to that end (*id.* ¶¶ 186-
87), Arcadis could reasonably foresee that various Enterprise Parties would endeavor to fulfill
their distribution objective.  In addition, the January 18, 2005 fax furthered the scheme because it
was incidental to the completion of the first allegedly fraudulent off-site transaction.  Similar
allegations involve the use of the mails on May 19 and June 1, 2005 to help execute the Second
Contract with Edgewood.  (*Id.* ¶ 227(13)-(14).)

　　　　Without delving into details of the remaining alleged communications among the
Enterprise Parties, suffice it to say, many, if not all, of the described acts in Edgewood's

Complaint satisfy the second element of 18 U.S.C. §§ 1341 and 1343.  These mailings and wire communications are described with specificity, including the date, time, or place of the alleged communications.  And while not every alleged communication itself contained fraudulent information, such an allegation is hardly required under Third Circuit and Supreme Court precedent.  *See Kehr Packages*, 926 F.2d at 1415; *Schmuck*, 489 U.S. at 710-11.  Thus, Edgewood sufficiently pleads the second element of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.  Further, as demonstrated by the Court's lengthy, earlier discussion of the formation of the enterprise, the parties to the scheme, and its division of labor, which included Arcadis, Edgewood also satisfies the third element of mail and wire fraud — Arcadis's participation in the scheme to defraud.

Arcadis argues that Edgewood must plead reliance on the allegedly false statements, but it hits a concrete wall with this theory.  First, Edgewood does plead reliance.  (Compl. ¶¶ 163-65, 172, 209.)  However, more importantly: "Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation."  *Bridge v. Phoenix Bond & Indem. Co.*, __ U.S. __, 128 S. Ct. 2131, 2138 (2008); *see also Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 828 F. Supp. 287, 294 (D.N.J. 1993) (declining "to read into RICO mail fraud cases a requirement of actual detrimental reasonable reliance") (Ackerman, J.).

Edgewood sufficiently alleges multiple predicate acts through the violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  Thus, Edgewood satisfies the predicate offenses required for an NJ RICO claim.

> **B.**     ***Edgewood Alleges a Predicate Act in Violation of N.J. Stat. Ann. §***

### *2c:21-16*

The Court additionally finds that Edgewood has sufficiently alleged a predicate offense in violation of N.J. Stat. Ann. § 2C:21-16: "A person commits a crime . . . if by deception as to the contents of the instrument, he causes or induces another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person." N.J. Stat. Ann. § 2C:21-16. The deception can occur by purposely failing "to correct a false impression which the deceiver previously created or reinforced[.]" N.J. Stat. Ann. § 2C:20-4; 33 N.J. Prac., Crim. Law § 17.25 (4th ed. 2008).

Where, as here, a plaintiff alleges a RICO conspiracy, it need not allege that the defendant agreed to personally commit the act, but only that the defendant agreed that other members of the enterprise will commit it, and that the defendant indirectly participated in the conduct of the enterprise's affairs. *See Ball*, 268 N.J. Super. at 143-44 ("In a conspiracy setting, it is not necessary that a defendant agree to personally commit predicate acts. He or she need only agree that other members of the conspiracy will commit such acts."); *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir. 1985) (concluding that "a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts"); N.J. Stat. Ann. § 2C:41-2(c), (d). "Participatory conduct or activities . . . may be found in acts that are below the managerial or supervisory level, and do not exert control or direction over the affairs of the enterprise, as long as the actor, directly or indirectly, knowingly seeks to carry out, assist, or further the operations of the enterprise or otherwise seeks to implement or execute managerial or supervisory decisions." *State v. Ball*, 141 N.J. 142, 175 (1995).

Here, Edgewood entered into the First Contract to receive crushed concrete "containing

26

constituents below NJDEP unrestrictive use criteria." (Compl. ¶ 49, Ex A.)  Edgewood alleges

that Ford and other Enterprise Parties represented to Edgewood that, under the terms of their

agreement, Edgewood would receive concrete suitable for residential zone use.  (*Id.* ¶ 54.)

Specifically, Edgewood alleges that Frank Sellinger, an Edgewood employee, received such

assurances as to the content of their agreement on two occasions from Ford, Alberici, and J&L

representatives in February 2005 while meeting in Edison, New Jersey.  (*Id.* ¶¶ 42-48.)  These

representations induced Edgewood to enter into the First Contract because Edgewood intended

to, and did, re-use the concrete at residential sites.  (*Id.* ¶¶ 54, 58.)  However, Edgewood alleges

that the Enterprise Parties purposefully distributed to Edgewood concrete that exceeded

residential zone criteria.[7]

Edgewood sufficiently alleges that it was deceived as to the contents of the First Contract,

i.e., the meaning of "unrestrictive use," because, accepting Edgewood's allegations as true, the

Enterprise Parties intended to misrepresent its contractual obligations and provide Edgewood

with concrete exceeding residential zone criteria.  (Compl. ¶¶ 57, 63, 64.)  Edgewood alleges that

Arcadis agreed that the Enterprise would deceive Edgewood (*id.* ¶¶ 144, 178, 233), and that

Arcadis contributed indirectly to this deception because it was partly responsible for the testing

and segregation of the concrete in preparation for Edgewood's receipt (*id.* ¶¶ 185, 187).  Thus,

Edgewood makes out a predicate act under N.J. Stat. Ann. § 2C:21-16.

### C.    *Edgewood Sufficiently Alleges a "Pattern of Racketeering Activity"*

---

[7] Some Enterprise Parties now claim that Edgewood contracted to receive concrete not
exceeding *commercial* use criteria, thus further suggesting that the Enterprise Parties deceived
Edgewood as to the contents of the First Contract.  (*See Ford Motor Co. v. Edgewood Prop.,
Inc.*, No. 06-1278, Doc. No. 125 ("Ford First Am. Compl.") ¶ 52; Doc. No. 76 ("EQ
Counterclaims") ¶ 58.)

Because Edgewood alleges multiple predicate acts under NJ RICO, N.J. Stat. Ann. §

2C:41-1(1), the Court now examines whether Edgewood alleges that the Enterprise's conduct

was sufficient to constitute a "pattern of racketeering activity" under N.J. Stat. Ann. § 2C:41-

1(d)(2).  To establish a "pattern of racketeering activity," a plaintiff must satisfy two

requirements.  First, a plaintiff must allege that the defendant engaged "in at least two incidents

of racketeering conduct . . . within [ten] years . . . after a prior incident of racketeering activity.

N.J. Stat. Ann. § 2C:41-1(d)(2).  Edgewood easily satisfies this requirement because the alleged

racketeering conduct took place between January and August 2005 in the course of fraudulently

contracting with, and/or distributing the crushed concrete to, Northeast Developers, Inc. (January

13, 2005), North Creek CCC (January 18, 2005), Edgewood (March 21, 2005), and Caruso

Excavating Co., Inc. (August 9, 2005).  (Compl. ¶¶ 193, 195-99, 201.)  In addition, the specific

acts of mail and wire fraud, and the allegedly fraudulent agreement with Edgewood, took place

within the same nine-month span in 2005.

Second, a plaintiff must make a showing that the "incidents of racketeering activity

embrace criminal conduct that has either the same or similar purposes, results, participants or

victims or methods of commission or are otherwise interrelated by distinguishing characteristics

and are not isolated incidents."  N.J. Stat. Ann. § 2C:41-1(d)(2).  Stated precisely, the various

racketeering acts must be (1) related to one another, and (2) continuous.  *Ball*, 141 N.J. at 168.

Continuity may be established "where it is shown that the predicates are a regular way of

conducting defendant's ongoing legitimate business . . . or of conducting or participating in an

ongoing and legitimate RICO 'enterprise.'"  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S.

229, 243 (1989); *see also Ball*, 141 N.J. at 167 ("The pattern of racketeering activity and the

28

activity criminalized under RICO should be, or threaten to be, ongoing.").

Here, it is doubtful whether Edgewood may establish that Arcadis's alleged racketeering activity poses an *ongoing* threat because the distribution of the concrete from the Ford site was completed over three years ago.  Further, Edgewood struggles to establish that this racketeering activity constituted Arcadis's "regular way of conducting" legitimate business.  Accepting Edgewood's allegations as true, Arcadis acted on opportunity; its narrow work with Ford, to the extent that Arcadis acted improperly, constituted an anomaly — not a regularity.  However, where, as here, a plaintiff alleges short-term RICO activity, "continuity" may be more easily conceived where the acts are part of a sequence, generally, as opposed to isolated acts.  *See Ball*, 141 N.J. at 168 (explaining that "short-term criminal activity, to be covered, must encompass incidents of criminal conduct that are not disconnected or isolated"); *see also id.* ("Incidents of racketeering that occur sequentially, to overcome any inference that they are totally disconnected or isolated, must exhibit some temporal connection or continuity over time.").  Here, Edgewood alleges that the acts committed by the Enterprise were part of a sequence that unfolded from January to August 2005.  Thus, while Edgewood's allegations of "continuity" based on the ongoing nature of the scheme are weak, its allegations of "continuity" stemming from the short-term, sequential nature of the acts are stronger.

Nevertheless, Arcadis argues that, "without the threat of ongoing future activity," Edgewood's NJ RICO claim must be dismissed.  (Arcadis Br. at 19.)  Arcadis buttresses its conclusion with a survey of Third Circuit case law holding that "a scheme involving a single victim over a short period of time" cannot comprise a "pattern of racketeering activity."  (*Id.* (citing *Hughes v. Consol.-Penn. Coal Co.*, 945 F.2d 594, 610 (3d Cir. 1991); *Kehr Packages*,

926 F.2d at1412; *Marshall-Silver Constr. Co. v. Mendel*, 835 F.2d 63, 67 (3d Cir. 1987)).)

Arcadis is mistaken.  Its argument, like its supporting case law, derives solely from the federal RICO statute.  *See Hughes*, 945 F.2d at 610 (adjudicating federal RICO claim); *Kehr Packages*, 926 F.2d at 1402 (same); *Marshall-Silver Constr.*, 835 F.2d at 67 (same).  Yet, a "'pattern of racketeering' has a definition under New Jersey's RICO law significantly different from federal law." *State v. Taccetta*, 301 N.J. Super. 227, 246 (App. Div. 1997); *see also Emcore Corp.*, 102 F. Supp. 2d at 255 (observing that "the New Jersey definition of pattern is more flexible and generous to plaintiffs than the federal standard").

"[U]nlike its federal counterpart," NJ RICO "does not put as much emphasis on 'continuity' to establish a pattern of racketeering activity." *Metz*, 61 F. Supp. 2d at 373.  Instead, the Supreme Court of New Jersey has pronounced that "the primary criterion of New Jersey's 'pattern of racketeering activity' is relatedness." *Ball*, 141 N.J. at 169.  Towards this end, the *Ball* Court called for "a broad standard involving the totality of all relevant circumstances, which *may* include continuity." *Id.* (emphasis added).  In other words, the Supreme Court of New Jersey implied that the "continuity" factor may be properly subsumed in the larger "relatedness" inquiry. *Id.* at 168 ("The factor of 'continuity' . . . may itself be established by evidence that overlaps the evidence establishing 'relatedness.'").  As outlined above, the "relatedness" factors are found in N.J. Stat. Ann. § 2C:41-1(d)(2): Acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics, and are not isolated events.

Here, Edgewood's allegations of racketeering activity satisfy "relatedness."  Edgewood alleges that the Enterprise Parties aimed to avoid the expense of "legally disposing of the

contaminated concrete" by improperly distributing the material to third parties.  (Compl. ¶¶ 189-95.)  This common scheme allegedly victimized similarly-situated parties, such as Edgewood and North Creek CCC, in similar ways: by receiving the concrete at no cost in exchange for removing from the Plant what these parties believed to be concrete containing lawful and/or specified levels of PCBs.  (*Id.* ¶¶ 41, 196-98.)  Arcadis purportedly advanced the scheme against these outside parties over a similar period of time — January to August 2005 — until the same pool of contaminated concrete at the Ford Plant was emptied.  This common scheme was accomplished with the aid of a series of related mail and wire communications and at least one deceptive contract (i.e., the First Contract) that executed the Enterprise's goal.  Thus, the predicate acts and various concrete distributions were not isolated events, but rather shared a method of commission, purpose, participants, and results.

While Edgewood has difficulty alleging a pattern of ongoing activity, the totality of the relevant circumstances demonstrate "relatedness" sufficient to establish a "pattern of racketeering activity" under NJ RICO.  *Cf. Metz*, 61 F. Supp. 2d at 374 ("Although the plaintiffs' case for continuity is not particularly strong, they have sufficiently alleged relatedness."); *Tacetta*, 301 N.J. Super. at 246 (embracing that NJ RICO "does not . . . require individualized proof of both continuity and relatedness").  Thus, Edgewood makes out a claim under NJ RICO.  Edgewood sufficiently alleges the existence of an enterprise that engaged in activities affecting trade or commerce; Arcadis's association and participation in the enterprise; the commission of two or more predicate acts in furtherance of the enterprise scheme; and conduct constituting a "pattern of racketeering activity" within the meaning of NJ RICO.  Arcadis's motion to dismiss Count VII will be denied.

**VI.**   **Edgewood States a Claim for Civil Conspiracy.**

Under New Jersey law, a civil conspiracy is "a combination of two or more persons

acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a

principal element of which is to inflict a wrong against or injury upon another, and an overt act

that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005).  The "gist of

the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy,

would give a right of action." *Id.* (internal citations omitted).  A conspiracy need not be proven

directly, but rather can be inferred from the circumstances.  *Kronfeld v. First Jersey Nat'l Bank*,

638 F. Supp. 1454, 1469 (D.N.J. 1986) (Ackerman, J.) ("[A] conspiracy often is established by

inferences from circumstantial evidence").  "Not every conspirator must commit an overt act in

furtherance of the conspiracy, so long as at least one does." *Morganroth & Morganroth v.*

*Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003); *see also In re*

*Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) ("That a particular

defendant may or may not have joined in a specific overt act in furtherance of the conspiracy,

such as attending a meeting, does not affect its status as a conspirator.").

While a conspiracy may be inferred from circumstantial evidence, in the case of a claim

of conspiracy to defraud, courts in this District have held that such claims are subject to the

specificity requirements of Rule 9(b).  *Kronfeld*, 638 F. Supp. at 1468.  "Accordingly, the

circumstances of the alleged fraud must be pleaded specifically, and a plaintiff is further required

to identify the source of the allegedly fraudulent misrepresentation or omission at issue." *Shan*

*Indus., LLC v. Tyco Int'l (US), Inc.*, No. 04-1018, 2005 U.S. Dist. LEXIS 37983, at *34 (D.N.J.

Sept. 9, 2005) (Ackerman, J.).

Here, as the Court has already found, Edgewood alleges that Arcadis and others (Ford, Alberici, and Golder) agreed in December 2004 on a plan to distribute contaminated concrete to outside parties, including Edgewood, as an inexpensive means of disposing of the material. (Compl. ¶¶ 35-38, 144, 194.)  The Enterprise Parties schemed to defraud Edgewood by offering crushed concrete to Edgewood while knowingly misrepresenting its contamination levels.  This conspiracy was furthered by several overt acts, such as Ford's entry into the First Contract with Edgewood, the April 27, 2005 memorandum sent from Golder to Edgewood reinforcing the conspiracy's fraudulent conduct, and Edgewood's receipt of concrete in excess of residential zone limits.  Some of these overt acts were committed by parties other than Arcadis; others, like Arcadis's testing and segregation of contaminated concrete in preparation for Edgewood's removal, were committed by Arcadis.  The underlying harm to Edgewood lied in its receipt of concrete unsuitable for residential use.  This Court finds that Edgewood pleads this civil conspiracy claim with particularity, identifying the time period, purpose, and division of labor of the conspiracy, as well as the date and place of the misrepresentations, their promulgators, and their content.  Thus, Edgewood states a claim for civil conspiracy and Arcadis's motion to dismiss Count VI will be denied.

## CONCLUSION & ORDER

For the foregoing reasons, Arcadis's motion to dismiss (Doc. No. 8) is GRANTED IN PART and DENIED IN PART.  Count III (Common Law Strict Liability) of Edgewood's Complaint as against Arcadis is DISMISSED.  All other remaining claims against Arcadis shall

remain.


Newark, New Jersey
Dated: January 27, 2009

<u>/s/ Harold A. Ackerman</u>
U.S.D.J.